ANCHOR PACKING
COMPANY, Plaintiff,

v.

PRO–SEAL, INCORPORATED, a Michigan corporation, Jeffrey H. Hill, Bruce W. McCartney, Karl Rykert and Stephen Lonn, jointly and severally, Defendants.

Civ. A. No. 87–CV–74040–DT.

United States District Court,
E.D. Michigan, S.D.

June 14, 1988.

William T. Coleman, Detroit, Mich., for plaintiff.

Mark C. Pierce, West Bloomfield, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

Defendants, Pro–Seal, Incorporated, Jeffrey H. Hill, Bruce W. McCartney, Karl Rykert and Stephen Lonn, appeal a February 23, 1988 ruling of a magistrate who denied their motion which sought the disqualification of the attorneys for the Plaintiff, Anchor Packing Company.[1] Following an oral argument regarding the issues on May 10, 1988, this Court took the matter under advisement.

---

1. The Plaintiff is represented by the law firm of Pepper, Hamilton and Scheetz (hereinafter called Pepper).

Plaintiff initiated this lawsuit on November 6, 1987, charging the Defendants[2] with breach of contract, breach of covenants not to compete and tortious interference with business relations. Three days later, this Court (1) issued a preliminary injunction which restrained the Defendants from the use of any Anchor Packing trade secrets in their possession during the pendency of this cause, (2) ordered the return of certain designated material, and (3) denied a request for the enforcement of the covenants not to compete.

The basis for the Defendants' appeal to this Court concerns Pepper's joint representation of Anchor Packing, Hill, McCartney, Rykert and Lonn in an employment termination suit that had been brought against them by Wilbur Meirotto.[3] In the instant lawsuit, the Defendants contend that Pepper has an unfair advantage because it obtained substantial information during the *Meirotto* litigation which can now be used against them in this cause.

The Magistrate, to whom the matter was assigned, denied the Defendants' request for disqualification after holding an extensive hearing on the issue. However, his ruling on the issue was extremely brief:

> In effect there—the Pepper, Hamilton and Scheetz was representing Anchor Packing and the various named individuals as against Mr. Meirotto.
>
> It's this joint representation that I think takes this case out of the gambit of any potential of there being an exchange of confidence or secret that might work to the detriment of, of the Defendants in this matter, and it is for that reason that

this Court will be inclined to—the Court will deny the motion to disqualify Plaintiff's attorneys in this matter.[4]

The Magistrate made no other conclusions of law or findings of fact and, unfortunately, failed to cite any authority or provide any analysis for his decision except as noted above.

Under *Fed.R.Civ.P.* 72(a), the ruling of a magistrate on a non-dispositive pretrial matter can only be overturned if the decision is "clearly erroneous or contrary to law." Anchor Packing argues that the order of the Magistrate should not set aside "unless the Court has a firm and definite conviction that a mistake has been made."[5] This Court will assume *arguendo* that this is the correct standard of review.[6]

In the instant case, the magistrate determined as a matter of law that clients, who are jointly represented by one law firm, can have no reasonable expectation of confidentiality with regard to statements which may have been made by them during the course of the attorney-client relationship.

The typical disqualification motion usually involves a "successive representation" scenario, in which an attorney represents a party who initiates legal action against a former client. In such a situation, the ethical issue which is raised is whether "[t]he current client's interest in a vigorous representation potentially threatens the former client's interest in maintaining the confidentiality of all disclosures made to his attorney during the prior representation."[7]

---

**2.** Defendants are former employees of Anchor Packing who left their respective sales positions with the company to begin their own business, ProSeal, Inc.

**3.** *Meirotto v. Anchor Packing Co. et al,* No. 86–71881 (E.D.Mich.).

**4.** Tr. at 41 (February 23, 1988).

**5.** Memorandum of Law at 5.

**6.** This Court believes that relatively little deference is due to a magistrate's purely legal determination. *See e.g. Adolph Coors v. Wallace,* 570 F.Supp. 202 (N.D.Cal.1983) (the phrase "clearly erroneous" in the rule is distinct from the phrase "contrary to law"). Moreover, appellate

courts generally apply a "clearly erroneous" determination to the factual findings of a district court, but use a *de novo* review of a district court's legal conclusions. Since this is an appeal of a legal determination by a magistrate, the normal appellate standard should be applied in this controversy. However, since the decision of this Court regarding the issue in controversy would be the same under either standard, the more rigorous evaluation, which has been advocated by Anchor Packing, will be employed.

**7.** Developments in the Law, *Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244, 1315 (1981).

However, this case involves a distinctly different situation in which the law firm involved is not simply representing a new client against a former client. Here, the Plaintiff and the Defendants are all former clients of the same law firm who represented their respective interests in *Meirotto*. This "joint representation" context has been viewed differently from a successive representation case by several courts.

In *C.A.M. v. E.B. Marks Music, Inc.*,[8] the court noted that in the standard successive representation case, disqualification would only be granted "where the current representation is substantially related to the former representation."[9] It also held that prior to the application of the substantial relationship test, the moving party must demonstrate that "the attorney was in a position where he *could* have received information which his former client might reasonably have assumed the attorney would withhold from his present client."[10]

The *C.A.M.* court further determined that since any secret which would have been revealed by one party to his attorney during the joint representation would have necessarily been revealed to the primary client, the later representation of the primary client against the other client could not disclose any secrets. The court stated that "there was no expectation that information would be concealed from the primary client."[11]

Defendants argue that the Magistrate erred in relying on *C.A.M.* and assert that the better authority is *Brennan's Inc. v. Brennan's Restaurants, Inc.*[12] In *Brennan's*, the court conceded that neither party in a joint representation case could assert the attorney-client privilege against the other as to matters which were comprehended by the joint representation.[13] However, the Court relied upon the American

Bar Association (ABA) Code of Professional Responsibility to hold that a lawyer's "ethical duty is broader than the evidentiary privilege."[14] It then quoted substantially from the Code and held that a lawyer is ethically forbidden from using information, which was acquired from a client during the course of an attorney-client relationship, against the client in a later proceeding. The *Brennan's* approach was also used by the court in *St. Alban's Financial Co. v. Blair*.[15]

This Court finds the approach in *Brennan's* to be far more persuasive than the rationale which was adopted by the Magistrate. Thus, this Court concludes that the Magistrate erred as a matter of law in following the approach which was utilized in *C.A.M.* This Court strongly disagrees with the Magistrate because neither he nor those cases which ostensibly support his position ever addressed the ethical obligation of an attorney in this situation. The *Brennan's* Court held that:

> "This ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of information or the fact that others share the knowledge." ABA Code of Professional Responsibility, EC 4-4 (1970). "A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client. . . ." *Id.* EC 4-5. The use of the word "information" in these Ethical Considerations as opposed to "confidence" or "secret" is particularly revealing of the drafters' intent to protect all knowledge acquired from a client, since the latter two are defined terms. *See id.*, DR 4-101(A). Information so acquired is sheltered from use by the attorney against

---

**8.** 558 F.Supp. 57 (S.D.N.Y.1983).

**9.** *Id.* at 59.

**10.** *Id.* (emphasis in original), *citing Allegaert v. Perot*, 565 F.2d 246, 250 (2d Cir.1977).

**11.** *Id.* The magistrate's reasoning appears to have been drawn from the *C.A.M.* line of cases.

**12.** 590 F.2d 168 (5th Cir.1979). The parties apparently agree that there is no case within the Sixth Circuit on point regarding this narrow issue of joint representation.

**13.** *Id.* at 172.

**14.** *Id.*

**15.** 559 F.Supp. 523 (E.D.Pa.1983).

his client by virtue of the existence of the attorney-client relationship. This is true without regard to whether someone else may be privy to it. *NCK Organization v. Bregman,* 542 F.2d 128, 133 (2d Cir.1976). The obligation of an attorney not to misuse information acquired in the course of representation serves to vindicate the trust and reliance that clients place in their attorneys. A client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the client in the same matter. As the court recognized in *E.F. Hutton & Co. v. Brown,* 305 F.Supp. 371, 395 (S.D.Tex.1969), this would undermine public confidence in the legal system as a means for adjudicating disputes.[16]

Moreover, "[t]he Code of Professional Responsibility adopted by this Court is the Code of Professional Responsibility adopted by the Supreme Court of Michigan, as amended from time to time by that state court."[17] At the present time, the Michigan Supreme Court adheres to the A.B.A. Code of Professional Responsibility.

The result in applying those standards of professional conduct to this case would be the same as in *Brennan's.* A lawyer shall not "use *information* relating to the representation to the disadvantage of the former client."[18] This Court agrees with the Defendants who assert that the use of the word "information" clearly indicates that more than mere "confidences" are covered.[19]

The Court of Appeals for the Sixth Circuit has also expressed its unwillingness to tolerate a narrow and stultified reading of a lawyer's ethical obligations to a client. Thus, in an attorney disqualification case, one court held that "[i]n most situations, the *simple appearance* of a conflict would

be sufficient to cause this court to disqualify an attorney. *See* Canon 9 Code of Professional Responsibility."[20] Although *Melamed* did not involve a joint representation situation, it certainly suggests that the Sixth Circuit Court of Appeals looks upon the Canons of Ethics with great seriousness. This approach is far more in line with *Brennan's* than *C.A.M.*

Plaintiff makes several arguments against any reliance by this Court on the *Brennan's* analysis. First, Plaintiff asserts that (1) the joint representation in *Brennan's* and *St. Alban's* was generally of a longstanding nature and (2) the attorneys in those cases had "independent knowledge" of the crucial trademarks or instruments at issue. Plaintiff further contends that Pepper only represented the Defendants briefly in the *Meirotto* lawsuit and, in a rather conclusory fashion, asserts that "there are no prior agreements or legal matters from which [Pepper] could obtain any independent knowledge or information which could now be used against [the] defendants."[21]

Plaintiff's efforts to distinguish *Brennan's* and *St. Alban's* from the instant lawsuit must fail. *Brennan's* and *St. Alban's* did not turn on whether "instruments," which had been prepared by the attorney, were the core of the latter proceedings. These cases turned on evidence that the attorney's prior relationship with one client had given him information which he would be able to use against his former client. Moreover, the Plaintiff's arguments on this issue are tantamount to a contention that there is no "substantial relationship" between the earlier litigation and the current one because the same instrument is not involved in both proceedings. Plaintiff completely misses the point. The preliminary question is not whether a

**16.** *Brennan's Inc. v. Brennan's Restaurants, Inc., supra* at 172.

**17.** Appendix A to the Local Rules of the Eastern District of Michigan, Rule A–4.

**18.** Rule 1.9(b) of the A.B.A. Code of Professional Conduct (emphasis added).

**19.** *See also* Rule 1.6, Comment [5] ("The confidentiality rule applies not merely to matters

communicated in confidence by the client but also to all information relating to the representation, whatever its source").

**20.** *Melamed v. ITT Continental Baking Co.,* 592 F.2d 290, 293 (6th Cir.1979) (emphasis added).

**21.** Memorandum at 17.

"substantial relationship" exists between an attorney and a former client. The issue is whether there can ever be a disqualification based on an earlier joint representation despite a waiver of the attorney-client privilege. Only if the response is in the affirmative will the Court evaluate the matter of whether there is the requisite substantial relationship between the principals.

Finally, the Plaintiff's conclusory assertion (to wit, that Pepper could not have gained any independent knowledge) must be ignored. To the extent that this contention is based on the supposed brevity of Pepper's prior representation, it is belied by the affidavits of Hill and McCartney who unequivocally assert that they spent twenty hours with, and voluntarily disclosed substantial information to, that law firm.

Plaintiff also claims that the decision in *Domed Stadium Hotel, Inc. v. Holiday Inns*[22] supports its position that *Brennan's* must be narrowly limited to the facts in that case. In *Domed Stadium Hotel*, an attorney, who had jointly represented a franchisor and an association of franchisees for the purpose of appealing an adverse antitrust decision that had been brought by a third party, was not disqualified from subsequently representing a franchisee against the franchisor. On the basis of *Domed Stadium Hotel*, the Plaintiff submits that there are actually two kinds of joint representation cases:

(1) joint representations involving legal matters/transactions between parties who end up suing each other on the very same legal matters/transactions in which the attorney participated; and

(2) joint representations involving litigation against an unrelated third party where the joint parties subsequently sue each other.[23]

Plaintiff's argument is without merit for several reasons. First, it is abundantly clear in *Domed Stadium Hotel* that there was "a real question in [the mind of the Court] whether Holiday Inns, Inc. was a former client of the Kaye Scholer firm."[24] If the franchisor was not a former client of the Kaye Scholer law firm, then—contrary to the Plaintiff's assertions—the case does not involve joint representation since the franchisor had never been previously represented.

The second problem with the Plaintiff's argument is that the *Domed Stadium Hotel* court explicitly distinguished *Brennan's*. It specifically held that *Brennan's*:

does not require a different result because the Court there found disqualification of an attorney proper where he had jointly represented all of the parties until a falling-out of the family occurred. The court agreed with the district court that because of the joint representation of both parties to the suit, it would be a breach of the ethical duty of the attorney, because of the confidential relationship he had had with all the parties, to allow him to subsequently represent one of them against the other. *We do not have a similar joint representation* and a substantial relationship here as in the *Brennan's, Inc.* case.[25]

*Brennan's* was also distinguished by the court in *Domed Stadium Hotel*, in that Kaye Scholer had only handled an appeal for these two contestants, and as compared to the prosecution of a trial, the processing of an appeal is "entirely different, with much less client contact at the appeal level."[26] The instant dispute is more analogous to *Brennan's*, in that the joint representation involves the prosecution and the defense of issues at the trial level—not in an appellate forum. Finally, *Domed Stadium Hotel* fails to address any of the ethical obligations, about which this Court has previously spoken in this Opinion.

Thus, because it is distinguishable on the facts from this case and, in the judgment of this Court, wrong on the law, *Domed Stadium Hotel* is not of any assistance in

---

22. 479 F.Supp. 465 (E.D.La.1979).

23. Memorandum at 14.

24. *Id.* at 468.

25. 479 F.Supp. at 469 (emphasis added).

26. *Id.* at 468.

resolving the issues in controversy. Plaintiff's attempts to create a new distinction within the joint representation area contain the narrow construction of a lawyer's ethical obligations which the Court cannot accept.[27] Thus the Court accepts *Brennan's* and rejects the idea that an earlier joint representation puts a client at the mercy of his former lawyer and the other client.

■ Having found that joint representation cases are not meaningfully distinguishable from successive representation cases, the Court will now apply the existing Sixth Circuit law in the latter area. In *General Electric Co. v. Valeron*,[28] the court held that:

> A former client seeking to disqualify an attorney who appears on behalf of his adversary, need only to show that the matters embraced within the pending suit are *substantially related* to the matters or cause of action wherein the attorney previously represented him.

The remaining key legal issue is determining the meaning of "substantially related." In its Memorandum, the Plaintiff relies upon a district court case that adopted the standard of the Second Circuit which requires "a showing that the ["substantially related"] relationship between issues in the prior and present cases [must be] 'patently clear' ... [and] ... the issues involved [are] 'identical' or 'essentially the same.' "[29] However, in *General Electric Co. v. Valeron*,[30] the Court of Appeals for the Sixth Circuit explicitly rejected the idea that the "actual issues" of the two cases must be the same. The court stated:

> We note that the narrower formulation is not supported by case law generally and is contrary to the formulation as set out

by this court in *Melamed*, 592 F.2d (6th Cir.1979) at 292 and cases cited therein. As is stated in *Wilson P. Abraham Construction Co. v. Armco Steel Co.*, 559 F.2d 250 (5th Cir.1977), cited and relied upon in *Melamed*, at 252:

> [a] former client seeking to disqualify an attorney who appears on behalf of his adversary, need only to show that the matters embraced within the pending suit are *substantially* related to the matters or cause of action wherein the attorney previously represented him.

We also note that the narrower formulation might well be difficult to apply in practice since the actual issues in lawsuits are frequently not determined until long after the litigation has begun.[31]

The Ninth Circuit Court of Appeals in *Trone v. Smith* [32] opined that a substantial relationship "is measured by the allegations in the complaint and by the nature of the evidence that would be helpful in establishing those allegations."

In *U.S. Football League v. National Football League*,[33] the district court, although supposedly applying the more stringent standards which had been established by the Second Circuit Court of Appeals for disqualification, held that the mere difference between the causes of action in an earlier and a subsequent proceeding did not preclude a substantial relationship determination. The Court held:

> The presence of a common factual question meant that the substantial relationship test was satisfied. So there is a substantial relationship between the two

---

**27.** Plaintiff apparently argues that it has already received the "confidential" information which the Defendants claimed to have given to Pepper. Hence, it presumably believes that a change of attorneys would not make any difference. However, this Court cannot assume that Pepper transmitted all the Defendants' information to its "primary" client. Moreover, this Court must deter such action where possible by preventing it through disqualifications if cases are "substantially related." *Infra.*

**28.** 608 F.2d 265, 267 (6th Cir.1979) (emphasis in original).

**29.** *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 501 F.Supp. 326, 328–29 (D.C.D.C. 1980), citing, *Government of India v. Cook Industries*, 569 F.2d 737, 739–40 (2d Cir.1978).

**30.** *Supra.*

**31.** *Supra* at 267.

**32.** 621 F.2d 994, 1000 (9th Cir.1980).

**33.** 605 F.Supp. 1448 (S.D.N.Y.1985).

representations if facts pertinent to problems for which the original legal services were sought are relevant to the subsequent litigation.[34]

■ There are two caveats which must be mentioned prior to finalizing the "substantial relationship" issue. Even if a court does find a substantial relationship, such a determination does not constitute proof that an attorney has improperly utilized the information which had been given to him by his former client. It merely creates a presumption that the attorney will use this information because of the ethical obligation to vigorously represent the interests of his current client.[35] Second, this Court must keep in mind the importance of generally allowing parties to select the counsel of their choice.[36] Only by taking this policy seriously can the Court approach this disqualification motion with the requisite care.

The gist of Meirotto's Complaint against the four Defendants in this case was contained in Counts V–VII of his First Amended Complaint. In these counts, Meirotto essentially alleged that McCartney, Rykert, Hill and Lonn, all of whom were his immediate subordinates, became disgruntled with him and purposefully circumvented preexisting channels of authority within the company by directly persuading the Chief Executive Office to terminate his employment [37] under a threat of their collective resignations.

At first glance, his claims would seem to have little in common with the instant case. For example, the events in the *Meirotto* suit occurred in late 1985 and early 1986. The events in the instant case seem to involve events which occurred in late 1987. Moreover, the evidence which is central to the two Complaints would seemingly have

to be different if the time frames differed. In addition, the gist of Meirott's Complaint concerns the actions of the efforts of the Defendants to cause his ouster from the company. Such concerns are obviously not at issue here.

However, *U.S. Football League v. National Football League*,[38] made clear that the two claims do not have to be identical. Moreover, the Court of Appeals for the Sixth Circuit has specified that there need only be a substantial relationship between the kind of evidence involved in the two cases.

■ A careful examination of *Meirotto* and the instant cause suggests that a substantial relationship does exist. The key to the substantial relationship lies in the Defendants' Counterclaim. In particular, they make the following allegations against the Plaintiff in Paragraph 14 of their Counterclaim:

14. Counter–Defendant The Anchor Packing Company constructively terminated Counter–Plaintiffs employment without just cause and breached the agreement with Counter–Plaintiffs by the following acts:

a. Counter–Plaintiffs profit sharing participation was unilaterally terminated without the agreement of Counter–Plaintiffs.

b. Counter–Plaintiffs pension plan participation was unilaterally terminated without the agreement of Counter–Plaintiffs.

c. Counter–Plaintiffs sales commissions have been wrongfully withheld.

d. Employees of Garlock Industries, with the knowledge of, and/or at the instigation of The Anchor Packing

---

**34.** *Id.* at 1459.

**35.** *See e.g. T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265, 268 (S.D.N.Y.1953). The reasons for the declination of this Court to make a direct inquiry into whether improper information was transmitted were discussed in *U.S. Football League v. National Football League, supra* at 1461. The issue of whether these presumptions are rebuttable shall be discussed *infra.*

**36.** *See e.g. Laker Airways, Ltd. v. Pan American World Airways,* 103 F.R.D. 22, 27 (D.D.C.1984).

**37.** Count V: "Intentional Interference with Valid Business Expectancy." Count VI: "Interference with Contractual Relationship." Count VII: "Conspiracy."

**38.** *Supra.*

Company attempted to subvert Counter–Plaintiffs sales.

e. The Anchor Packing Company through their CEO John W. Guffey, Jr., threatened to alter Counter–Plaintiffs sales territories for the purpose of reducing the compensation which was earned by Counter–Plaintiffs.

f. Counter–Plaintiffs Bruce W. McCartney, Stephen Lonn and Karl Rykerts' compensation was cut by 20%, and Jeffrey Hills' compensation was cut 30%, unilaterally and in breach of the agreement.

In this Counterclaim, the Defendants essentially assert that the Plaintiff breached numerous obligations that it had undertaken as their employer. This Counterclaim has very distinct similarities to the Complaint in *Meirotto* where the aggrieved ousted employee similarly claimed that the Plaintiff had breached its employment obligations. Although Plaintiff will inevitably have to learn much about the precise nature of these allegations within the Counterclaim, it will have a huge and unfair advantage at the outset of these proceedings because Pepper has already obtained much of the needed information as the result of its previous attorney-client relationship with the Defendants in the earlier case.

It is noteworthy that the Plaintiff has not rebutted the February 3, 1988 affidavits of Hill and McCartney, both of whom stated that they spent twenty hours with Pepper in preparing a defense against Meirotto. Hill averred that he disclosed to Pepper:

> Many matters with regard to my employment relationship with Plaintiff, including a full disclosure of the nature of my relationship with Anchor Packing. There were specific discussions concerning

commissions owed to me which had not been paid, complaints which I had with Anchor Packing and the full history of my employment with Anchor Packing.[39]

McCartney said that he disclosed to Pepper "the full history of my employment relationship with Plaintiff. I specifically discussed with Mr. Coleman and Ms. Avidson an attempt made by Anchor Packing to discharge me, improper attempts to change my sales territories and all of the complaints which I had with Anchor Packing Co." [40]

The closeness of the relationship of these two cases is shown by Meirotto's unique position as the supervisor of the Defendants whose complaints about him were, in essence, expressions of disenchantment about their employment with the Plaintiff. Thus, by working with Pepper in the preparation of a defense against Meirotto, they revealed the exact nature of their grievances against the Plaintiff and Meirotto.

Plaintiff accuses the Defendants of filing a Counterclaim which lacks any cognizable legal basis. In particular, Plaintiff asserts that the allegations within the Counterclaim, which speak of a constructive termination without just cause, do not state a cause of action under Michigan law.[41] During an oral argument before this Court, Pepper, acting on behalf of the Plaintiff, asserted that an exhaustive research of the law on this issue revealed the absence of any case which would support the viability of such a theory. Therefore, the Plaintiff argues that the sole reason behind the Defendants' filing such a frivolous claim is only a tactical maneuver to get Pepper disqualified from serving as its counsel.

This Court shares the Plaintiff's concerns that disqualification motions not be used as mere tactical maneuvers.[42] The likelihood that a disqualification motion is

---

**39.** Hill Affidavit.

**40.** 3 McCartney Affidavit. Rykert's affidavit of February 19, 1988 contains similar statements.

**41.** The events, which have been placed in issue by the Complaint and Counterclaim, occurred in Michigan. The parties appear to have agreed through their respective pleadings that Michigan

law governs this controversy. This Court agrees.

**42.** *Cf. Dalrymple v. National Bank & Trust Company,* 615 F.Supp. 979, 985 (W.D.Mich.1985) ("the court must be ... sensitive to tactical considerations which may impel a party to seek disqualification of a particularly competent or formidable opponent").

being used for such a purpose seems to be enhanced when the moving party raises a potential ethical problem for the opposing counsel through a pleading such as a counterclaim. It also seems far more possible for tactical considerations to be at issue in such a situation where the litigation has already begun than when the conflict arises out of the Complaint.

On the other hand, this Court must also acknowledge the Defendants' right to litigate their case just as vigorously as the Plaintiff. It would be anomalous if the Plaintiff would be permitted to aggressively litigate its claims, but the Defendants were obliged to be more cautious about pursuing their Counterclaim out of fear that the Court would perceive its actions as having been initiated solely for tactical reasons.

■ This Court believes that the proper method of resolving these competing interests is to examine whether the allegations within the Counterclaim could survive a motion to dismiss under *Fed.R.Civ.P.* 12(b)(6).

In the instant case, and despite the Plaintiff's protestations to the contrary, this Court believes that the Defendants' Counterclaim would survive a 12(b)(6) motion. Plaintiff may be correct that no Michigan court has published an opinion which specifically addresses the viability of an allegation that an employment termination in the form of a constructive discharge was without "just cause" under the doctrine in *Toussaint v. Blue Cross & Blue Shield of Michigan.*[43] Plaintiff is also correct when it asserts that most of the Michigan constructive discharge cases involve allegations of discrimination.[44] However, the Plaintiff has overlooked several other cases whose analysis makes it abundantly clear that a *Toussaint* claim on the basis of a

constructive discharge would be viable in Michigan.

In *Jacobs v. St. Clair Co.,*[45] the court addressed the merits of a woman's claim that she had been "constructively discharged in violation of public policy."[46] The appellate court overturned the denial of a judgment notwithstanding the verdict by the trial court, holding that the evidence did not support a constructive discharge. Significantly, the legal theory of "constructive discharge in violation of public policy" was never even questioned.

The theory that a discharge can be wrongful because it is in violation of Michigan public policy is one of the few exceptions to the general rule in Michigan that employment is terminable at the will of the employer. In *Suchodolski v. Michigan Consolidated Gas Co.,*[47] the Michigan Supreme Court held that:

> an exception [to the "at will" doctrine] has been recognized ..., based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable.[48]

The Court in *Suchodolski* also stated:

> In general, *in the absence of a contractual basis* for holding otherwise, either party to an employment contract for an indefinite term may terminate it at any time for any, or no, reason. See generally *Toussaint.*[49]

It would make absolutely no sense if the public policy exception to "at will" doctrine could be extended to constructive discharges, but the very important *Toussaint* exception could not. Moreover, the Plaintiff has offered no plausible argument why *Toussaint* should not apply to constructive discharges except to report that no published opinions have addressed the issue. Although this Court is usually reticent to make novel interpretations of state law, it

---

**43.** 408 Mich. 579, 292 N.W.2d 880 (1980).

**44.** *See e.g. Jenkins v. American Red Cross,* 141 Mich.App. 785, 369 N.W.2d 2d 223 (1985).

**45.** 163 Mich.App. 230, 414 N.W.2d 161 (1987).

**46.** *Id.* at 237, 414 N.W.2d 161.

**47.** 412 Mich. 692, 316 N.W.2d 710 (1982).

**48.** *Id.* at 695, 316 N.W.2d 710. Aside from the public policy exception, the other major exception to at will doctrine in Michigan is found in *Toussaint v. Blue Cross and Blue Shield of Michigan, supra.*

**49.** *Id.* at 694–695, 316 N.W.2d 710.

must do so here because a refusal to extend *Toussaint* to constructive discharges is analytically indefensible.[50]

Even more importantly, *Toussaint* would be vitiated completely if it did not apply to constructive discharges. An adoption of the Plaintiff's view would enable employers to destroy *Toussaint* by allowing them to harass those employees, who could only be fired "for cause," out of their jobs. Under these circumstances, such an employee would have no recourse despite his "for cause" rights because the discharge was only constructive in form. There is simply no logic to such an interpretation of *Toussaint*.

Jury instructions in a constructive discharge claim under *Toussaint* could be accomplished by a three step process. First, the jury would have to determine whether a constructive discharge did, or did not, occur.[51] Second, the jury would have to determine if there was an agreement between the parties which provided for a discharge "for cause" only. Third, the jury would have to decide if the discharge was "for cause." The ease of applying this minor extension of *Toussaint* also counsels in its favor. Thus, for all the above reasons, the Court concludes that the Counterclaim is neither frivolous nor subject to dismissal under *Fed.R.Civ.P.* 12(b)(6).

Plaintiff also argues that the commission payments which the Defendants seek involve monies that are allegedly due from late 1987 and bear no connection to the controversy over commission payments in the *Meirotto* litigation.

There are several reasons why this argument must be rejected. First, the Defendants emphatically deny that their commission request is so limited. Second, Pepper may have obtained information regarding the Defendants' precise views as to how their commission should be paid during the prior suit. Such information would be potentially detrimental to the Defendants. Moreover, there are "for cause" termination issues here as in *Meirotto*. It is certainly conceivable that Pepper learned a great deal from the earlier litigation about the Defendants' views as to whether they have a just cause agreement.

Finally, there is some genuine concern by this Court as to whether Pepper adequately informed any of the individual Defendants at any time that it had a potential conflict of interest in representing them. It is clear from the Defendants' affidavits that they voiced complaints to Pepper about the operation and management of the Plaintiff. This was acknowledged by Pepper during the oral argument on May 10, 1988 before this Court. At that point in the *Meirotto* litigation, Pepper, who was representing multiple clients, knew that the individual Defendants (Hill, et al) were dissatisfied with the corporate Defendant (Anchor Packing). Indeed, Pepper has not rebutted the affidavits on this point. Although Pepper did provide the Defendants with an opportunity to retain their own counsel, the record indicates that the option was extended to them *prior* to the beginning of its representation of the multiple clients. However, immediately *after* the individual

---

**50.** *Cf. LeGalley v. Bronson Community Schools*, 127 Mich.App. 482, 339 N.W.2d 223 (1983) (constructive discharge theory discussed where discharge allegedly violated procedural provisions of Michigan statute). This Court also notes that a discharge which violates *Toussaint* would also appear to be in violation of Michigan public policy. *Toussaint* is now a well engrained part of Michigan law. As such, it would certainly seem to be a "recognized public policy," *Jacobs v. St. Clair Co.*, 163 Mich.App. at 237, 414 N.W.2d 161, of the State of Michigan. Nonetheless, because the Court recognizes that *Toussaint* is not a legislative enactment, the Court does not rest its decision in this case on this novel theory alone.

**51.** Plaintiff has not argued that the factual allegations within the Counterclaim are insufficient to show the level of "harassment" that is necessary for a constructive discharge. Thus, that question need not be addressed. However, the Court notes that the allegations of an unjustified withholding of commissions, the termination of pension and profit sharing plans, compensation cuts, threatened territory changes, and the "subverting" of the Defendants' sales, when viewed in combination, appear to state a cause of action for constructive discharge. *See e.g. Civil Rights Dept. v. Edward W. Sparrow Hospital Ass'n*, 423 Mich. 548, 377 N.W.2d 755 (1985); *Jacobs v. St. Clair Co., supra; Jenkins v. American Red Cross, supra.*

Defendants voiced their displeasures with the Plaintiff, Pepper's ethical obligations to them should have been voiced. Ethical Canon 5-19 of the Model Code specifies that a lawyer "should explain any circumstances that might cause a client to question his undivided loyalty." Plaintiff emphasizes that the Defendants were supposedly sophisticated. This assessment may, or may not, be correct. Nevertheless, it was, and continues to be, an attorney's obligation to explain every possible conflict of interest without regard to a client's purported sophistication. This was not done.

Given that Pepper failed to follow the Canons of Ethics, and considering that this failure has contributed to the ethical dilemma in which the law firm currently finds itself, this Court is not receptive to its concern over being disqualified from serving as counsel for the Plaintiff in this cause.

The evidence certainly shows a substantial relationship between the issues in controversy here and in *Meirotto*. Nevertheless, there remains a question of whether Pepper should be allowed to rebut the presumption that it violated client confidences. In *General Electric Co. v. Valeron*,[52] the Sixth Circuit Court of Appeals declined to resolve a conflict between the decision of one trial court, which held that the receipt of confidential information is *conclusively* presumed once the substantial relationship test has been satisfied, and the decision of another trial court which determined that the presumption was rebuttable.[53] However, the Courts of Appeal in the Fifth, Seventh, Eighth and Ninth Circuits have all determined that the presumption is generally not rebuttable.[54]

This Court believes the better view is that, absent exceptional circumstances, the presumption should not be rebutted. As discussed earlier, a test has been developed which specifically attempts to avoid requiring the Court to inquire into whether confidences were *actually* exchanged. Instead, the courts initially look to determine whether there is a substantial relationship between the two cases and then make presumptions on the basis of that relationship. The whole purpose of conducting a substantial relationship test and not making a direct inquiry into whether confidences were actually exchanged would be undermined if the Court was obliged to receive and evaluate rebuttal evidence. Moreover, the underlying purpose behind this restraint upon requiring the Court to make direct inquiries is also to avoid forcing clients to divulge the content of their communications with counsel.

In addition, the Plaintiff has never filed any affidavits which take issue with the Defendants' affidavits on these matters. Therefore, the Court must assume that the Plaintiff accepts the facts within the Defendants' affidavits as being true. Disturbingly, during the oral argument and for the first time, the Plaintiff made some vague assertions that the Defendants' affidavit were not accurate. This Court will not accept such unsworn contentions as having any value when made by lawyers with a pecuniary interest in not being disqualified and in the face of otherwise uncontradicted sworn affidavits.

This Court is also quite disturbed with another aspect of the oral argument by the Plaintiff which asserted that Pepper had held only one meeting with the individual Defendants in the *Meirotto* case. This meeting was held at a Detroit restaurant and purportedly attended by a representative of the Plaintiff. Pepper used the presence of the Plaintiff's representative to ar-

**52.** *Supra.*

**53.** 608 F.2d at 267.

**54.** *Duncan v. Merrill Lynch, Pierce, Fenner & Smith,* 646 F.2d 1020, 1028 (5th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981); *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266–67 (7th Cir.1983); *Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 608 (8th Cir.1977), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978), *overruled on other grounds, In re Multi–Piece Rim Products Liability Litigation,* 612 F.2d 377 (8th Cir.1980); *Trone,* 621 F.2d 994, 1000 (9th Cir.1980).

gue that the individual Defendants could not have possibly had any expectation of confidentiality.

These initial comments were quite misleading. After some prodding by the Court and opposing counsel, Pepper conceded that it actually had several meetings with the individual Defendants and that representatives from the Plaintiff were not present at any time except for the one meeting in the restaurant. This Court will not speculate as to why Pepper made these misrepresentations. It is hoped that carelessness or overzealous advocacy was the cause rather than a deliberate effort to mislead the Court. Nonetheless, the Court is extremely displeased at these actions and strongly suggests that Pepper become more forthright in the future.

Finally, Pepper argues that the four individual Defendants essentially received gratuitous legal services in connection with the *Meirotto* case. Apparently, Pepper believes that this mitigates against disqualification. Unfortunately, Pepper fails to acknowledge that these individual Defendants, in an ostensible exchange for the "free" legal service, provided information to the Plaintiff which may now be used against them.

Thus, for all the above reasons, this Court will reverse the Magistrate and grant the Defendants' Motion to Disqualify. Plaintiff shall have thirty days from the date of this Order in which to obtain new counsel.

IT IS SO ORDERED.