William R. **HARRIS, Individually and as Trustee of the William R. Harris Trust U/T/D October 18, 1985, Otto Gago, William Parker and Carolyn Parker, Plaintiffs,**

v.

**AGRIVEST LIMITED PARTNERSHIP II, a Michigan Limited Partnership; Michigan National Bank, a National Banking Association; 4–11 Corporation, a Michigan Corporation; Thomas A. Dell, Barry A. Breakey, Brian M. Bartley, Michael H. Oesterle, and William M. Hawks, Jr.; Rose, Schmidt, Chapman, Duff & Hasley, a Pennsylvania Partnership; Jointly and Severally.**

**Civ. A. No. 91–CV–40185–FL.**

United States District Court, E.D. Michigan, S.D.

Jan. 26, 1993.

See also 818 F.Supp. 1042.

Elwood S. Simon, Cherie D. Redman, Elwood S. Simon & Associates, P.C., Bloomfield Hills, MI.

Anthony V. Trogan, Jr., Weisman, Trogan, Young & Schloss, P.C., Birmingham, MI.

Edmund M. Carney, Brian Ashbaugh, Rose, Schmidt, Hasley & DiSalle, Pittsburgh, PA.

John R. Spreitzer, Michigan National Corp., Legal Dept. (10–09), Farmington Hills, MI.

Chris L. McKenney, Thomas B. Bourque, Conlin, McKenney & Philbrick, P.C., Ann Arbor, MI.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

Pending before the Court is the motion of Defendant Agrivest Limited Partnership, II ("Agrivest II") to disqualify plaintiff's counsel, Elwood S. Simon ("Simon").

### Facts

Plaintiff's counsel Simon currently works for a firm that bears his name only. He previously was a shareholder at the firm of Schlussel, Lifton, Simon, Rands, Galvin & Jackier, P.C. ("Schlussel, Lifton").

William R. Harris ("Harris" or "Plaintiff") is one of several named plaintiffs in the pending lawsuit against the partnership, Agrivest Limited Partnership II. Harris and the other plaintiffs were limited partners in Agrivest II, an investment venture formed to profit in the hog business in 1986. Mr. Brian Bartley was general partner of Agrivest II.

Attorney Richard Barr ("Barr") was an associate at Rose, Schmidt, Chapman, Duff & Hasley ("Rose, Schmidt") from August, 1986 until February, 1987. While at Rose, Schmidt, Barr performed legal work in connection with the closing of the Michigan National Bank loan on behalf of Agrivest II. Barr worked with attorney Michael Oesterle on the Agrivest matter while at Rose, Schmidt. Along with Agrivest II, both Oesterle and Rose, Schmidt are named defendants in the instant case.

Either Harris or Harris Design Service, Inc. was a client of Rose, Schmidt in 1986. Rose, Schmidt performed work for Harris unrelated to the Agrivest II investment; Harris was a limited partner in Agrivest II at the time. Barr appears to have also worked for Harris on the closing of the initial Agrivest financing while at Rose, Schmidt. (Barr Deposition at 56, Defendant Agrivest's Exhibit A or "Tr. 56".)

In February, 1987 Barr left Rose, Schmidt and took a position with Schlussel, Lifton. Plaintiff's attorney Simon was a shareholder of Schlussel, Lifton at the time Barr worked there, but he did not work on matters for either Harris or Agrivest II while at that firm. Barr, however, worked for Agrivest II and for Harris while he worked at Schlussel, Lifton. Since the exact relationship between Barr and the two parties is essential to understanding the ethical issues, the Court quotes at length from Mr. Barr's deposition, Tr. 60–62:

(Mr. Barr has just stated that he worked for Agrivest II at Schlussel Lifton)

Q: In what connection?

A: Well, at the request of Mr. Harris I assisted the partnership in negotiating loan workouts with Michigan National Bank and the Federal Land Bank and

various documents that were required in connection with those matters.

Q: When did this happen?

A: I believe it started in the summer or fall of 1989 and continued until sometime in the early or middle parts of 1990, though the months are a little blurry, but roughly that period of time, give or take.

Q: Who did you send your bills to for this work?

A: Well initially the bills were sent to Mr. Harris and at a certain point I believe Mr. Harris indicated that it would be more appropriate for the partnership to be receiving the bills and I don't remember which month at a certain point the bills became readdressed ...

Q: At the time Mr. Harris asked you to become involved in the Agrivest II matter were you at the Schlussel, Lifton firm representing Mr. Harris or his companies on any other matters?

A: Yes.

Q: Did they involve Agrivest II or were they with respect to other interests he had?

A: Both.

Q: Well let's address the matter of Agrivest II. In what connection were you representing Mr. Harris with respect to the Agrivest II limited partnership?

A: My recollection is that at some point, I believe in 1989, Mr. Harris contacted me and indicated that Mr. Bartley had contacted him requesting the—requesting funds from Mr. Harris. Mr. Harris asked for my counsel on that transaction, as I might call it loosely, and my assistance in negotiating whatever terms and documents would be appropriate for Mr. Harris to advance funds to either Mr. Bartley or the Agrivest II—or Agrivest Limited Partnership II. That process resulted in negotiations with Mr. Bartley on behalf of Mr. Harris to a point that I believe, I don't want to say it was a conclusion but at least was a resting point, and at that time I believe the parties realized that the problem or the underlying need for the funding request to Mr. Harris was that the partnership was unable to make its payments to its bank lenders, its mortgagees, and Mr. Harris thought it would be beneficial to him for me to assist the partnership in trying to work out those problems for the benefit of Mr. Harris and the partners.

Tr. 60–62.

During either 1989 or 1980, while working at Schlussel, Lifton on the Agrivest II matter for either Harris, Tr. 79, or Agrivest, Tr. 74, Mr. Barr became concerned that Mr. Oesterle had withheld information from him or misrepresented information regarding the terms of the securities offering. Tr. 73. Mr. Barr spoke with both Mr. Bartley and Mr. Harris about it. Tr. 74–75.

In June, 1990, Barr took a position with Mason, Steinhardt, Jacobs & Perlman. While there, he continued to work for Harris and Agrivest II. At some point thereafter, Barr stopped performing work for Agrivest II, and he recommended to Harris that Harris hire Simon, who was by that time with Simon & Associates, concerning the dispute between the limited partners and Agrivest II.

Agrivest II alleges that Barr obtained confidential, privileged information through the course of his representing Agrivest II which he transferred to Simon to use against Agrivest II in this lawsuit. Even if such information was not actually transferred, Agrivest II claims Simon had access to information in the files at Schlussel, Lifton and should be disqualified.

Simon has submitted an affidavit denying any recollection of learning information about Agrivest while at Schlussel, Lifton. His memorandum suggests that while Barr has told Simon information about Agrivest II, none of it is information that Harris did not know. Barr cited the attorney-client privilege when asked about what he told Simon about Agrivest after Harris retained Simon. Simon also contends that the work that Schlussel, Lifton did for Agrivest II is unrelated to the lawsuit.

This last point appears not to be accurate. Mr. Barr worked on matters for Agrivest II at Schlussel, Lifton during which he discovered alleged misconduct that provides the basis for this lawsuit. Tr. 73. This lawsuit concerns the financing of the partnership, and Mr. Barr worked on the financing.

*Analysis*

This Court follows Local Rule 111.1(d)(2) of the Eastern District of Michigan which states:

Acts or omissions by an attorney admitted to practice before this Court, individually or in concert with any other person or persons, which violate the Rules of Professional Conduct adopted by the Michigan Supreme Court, as amended from time to time, shall constitute misconduct and shall be grounds for discipline.

LR 111.1(d)(2), amended January 1, 1991. Therefore, Michigan's Rules govern this question. Michigan changed from the Code of Professional Responsibility to the Model Rules during the period for which the events transpired.

Both sides cite MR 1.9 as the relevant provision: M.R. 1.9(b) states as follows:

Unless the former client consents after consultation, a lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated has previously represented a client

(1) whose interests are materially adverse to that person, and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter.

Model Rule 1.9

The reason for MR 1.9 is clear, "There is a public interest in assuring every client that communications to a lawyer will not be used adversely in the lawyer's later work. Situations that create a realistic risk that that will occur are those in which the former-client conflict rules should require disqualification." Charles W. Wolfram, *Modern Legal Ethics* § 7.4 at 360 (Student Ed.1986).

Mr. Simon is knowingly representing a person, Mr. Harris, in a "substantially related matter" in which Simon's previous firm, Schlussel Lifton, has previously represented Agrivest. Under this rule, Mr. Simon is disqualified if his firm represented Agrivest II in a matter materially adverse to Mr.

Harris and if he acquired information subject to 1.6 and 1.9 that is material.

■ With regard to Model Rule 1.9(b)(1), the Court does not believe that Defendants have demonstrated that, *at the time* Mr. Barr and other Schlussel Lifton attorneys performed work for Agrivest II, that the interests of the limited partners were adverse to those of Agrivest II. In fact, as Plaintiffs point out, a fiduciary relationship existed between the partnership and its limited partners, in which the partnership had to provide the limited partners with access to information. M.C.L. § 449.1305 (1989).[1] Mr. Barr was asked by a limited partner to take on legal work for Agrivest II. Plainly, neither Mr. Harris nor Mr. Bartley thought at the time that their interests were adverse to one another concerning the financing of the partnership, or neither one would have wished to share an attorney with the other. *See* Charles W. Wolfram, *Modern Legal Ethics* § 7.3 at 358 (Student Ed.1986).

However, it now appears in hindsight that the interests of Harris and Agrivest II were quite possibly adverse to one another at the time. Since at the time of the joint representation, however, the interest appeared to be synonymous, it seems unreasonable to apply Model Rule 1.9(b)(1) to this circumstance.

■ A lawyer who represents both a partner and a partnership at a time when their interests are not adverse is not in the same situation as a lawyer who is representing two unrelated clients. The attorney who owes ethical obligations to two clients is never in a good position. However, when those clients owe each other a fiduciary duty and must disclose all information to each other as part of that duty, and the attorney is performing work for both parties during the same time period on partnership business, then the attorney for the partnership should not have a duty of confidentiality concerning partnership matters with regard to the partner.

---

1. M.C.L. § 449.1305, section 305 of the Revised Uniform Limited Partnership Act, provides limited partners with the right to obtain partnership records and "(2)(i) true and full information regarding the state of the business and financial condition of the limited partnership, ... (iii) other information regarding the affairs of the limited partnership as is just and reasonable."

At oral argument, Plaintiffs claimed Mr. Barr worked principally for Mr. Harris while he was at Schlussel, Lifton. That is, Harris only brought Barr in to work for Agrivest II because it would ultimately benefit Harris. This was known to Agrivest II at the time of the representation, and therefore, Agrivest II should have no expectation that Barr's loyalty would run to it, if ever the interests of Harris and Agrivest II diverged. The Court need not embrace this novel theory of hierarchy of loyalties however. As long as the interests appeared to be synonymous at the time, Model Rule 1.9(b)(1) is not invoked.

■ The reason for disqualifying a partner of a firm from performing work adverse to a former client of that firm is that because of that partner's access to information, he is imputed with all knowledge contained in the firm's files. That rationale evaporates when a fiduciary duty is imposed upon the former client to share information with the party who only *later* becomes an adverse party.

■ Secondly, MR 1.9(b)(2) also seems not to apply. Mr. Simon has filed an affidavit that he learned no information concerning the Agrivest II matters while he worked at Schlussel, Lifton. Mr. Simon may, however, have acquired information regarding the Agrivest matter from Mr. Barr after Mr. Simon left Schlussel, Lifton and Mr. Barr had ceased working for Agrivest II. Because of the attorney—client privilege, it is unknown what conversations the two men had since this litigation began. However, the Court does not believe that information is material in the issue before it. MR 1.9 is geared toward protecting former clients from having information revealed that they told in confidence to their attorney.

While Mr. Simon's former firm was engaged in representing Agrivest II, Mr. Simon learned nothing of the case. Therefore, anything he has learned from Mr. Barr, he learned not because he was formerly at Schlussel, Lifton, but rather because he is the current attorney for the limited partners. Since MR 1.9 is designed to protect disclosure of information from one's former law-

yers, it would strain reason to apply MR 1.9(b)(2) to knowledge obtained by Mr. Simon after he ceased working at Schlussel, Lifton.

■ The Court submits that the most troublesome aspect of Mr. Simon's representation concerns what Mr. Barr may have said to him, and it appears irrelevant from a practical standpoint in this case that Mr. Simon formerly worked for Schlussel, Lifton. However this Court does not believe that Mr. Barr violated the rules of nondisclosure in sharing information about Agrivest II with Mr. Harris or Mr. Simon.

It is not the case that merely representing the partnership gave Mr. Barr the right to, without permission, share any information he wished to share, with the partners. The attorney does not have the right to perform a client's legal obligations for it without consent. Rather, Mr. Barr took on his obligations to Agrivest II and to Mr. Harris with the knowledge of each other, so that there was never any reasonable expectation of confidentiality on matters for which he was working in both their interests. For instance, Mr. Barr testified that some of his work for Agrivest II was paid for by Mr. Harris.[2]

■ Finally, even if Mr. Barr did breach a duty to Agrivest II by disclosing information to Mr. Simon, that disclosure would not automatically require Mr. Simon's disqualification, and Agrivest has not shown how it has been harmed. Admittedly, this Court has not provided it with a good opportunity to do so, because it has upheld the attorney—client privilege between Mr. Barr and Mr. Harris. Because the Court finds it unlikely that Mr. Barr had knowledge from Agrivest II that Mr. Harris had no right to know, however, the Court refuses to order an attorney to break the privilege.

This matter is distinguishable from Chief Judge Cook's opinion in *Anchor Packing Co. v. Pro–Seal, Inc.,* 688 F.Supp. 1215, 1218–19 (E.D.Mich.1988), which involved a law firm's

---

**2.** None of this is to say that the Court lauds Mr. Barr's behavior. The Court thinks it fairly obvious that Mr. Barr acted with a lack of good judgment in agreeing to work for both the part-

ner and the partnership. Moreover, his disclosure of material information to limited partners other than his client may well constitute an ethical violation. Tr. 77–78.

prior representation of a corporation and key employees in a lawsuit. The employees left to start a competing business, and the corporation used the same law firm to sue its new competitor for breach of contract, breach of covenant, and tortious interference with business relations. The court relied upon the Fifth Circuit's decision in *Brennan's Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168 (5th Cir.1979). In *Anchor Packing*, the court followed *Brennan's Inc.*, which held that:

> "A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client...." [citing to A.B.A. Code of Professional responsibility, EC 4–5]. The use of the word "information" in these Ethical Considerations as opposed to "confidence" is particularly revealing of the drafters' intent to protect all knowledge acquired from a client, since the latter two are defined terms. Information so acquired is sheltered from use by the attorney against his client by virtue of the existence of the attorney-client relationship. *This is true without regard* to whether someone else may be privy to it ...

*Anchor Packing*, 688 F.Supp. 1215, 1217–18, *quoting Brennan's*, 590 F.2d 168, 172 (emphasis added).

The *Anchor Packing* court, relying upon the above reasoning, held that "joint representation cases are not meaningfully distinguishable from successive representation cases." *Anchor Packing*, 688 F.Supp. at 1220. The court then applied *General Electric Co. v. Valeron*, 608 F.2d 265, 267 (6th Cir.1979), which established that a former client seeking disqualification of an attorney appearing on behalf of his adversary need only show that the matters embraced within the pending suit are substantially related to the matters in which the attorney had represented him. *Anchor Packing*, 688 F.Supp. at 1220.

The case at bar is distinguishable from *Anchor Packing* on several crucial grounds: (1) Simon never personally represented Agrivest II, and he is no longer with Schlussel, Lifton. (2) The former joint representation was not a matter of litigation, but rather a business transaction, and "In general, lawyers are given considerably greater latitude to represent clients with potentially differing interests in nonlitigation matters." Wolfram, *supra*, § 7.3.4 at 356 & n. 43. (3) The current case is governed by the Model Rules, and whereas "former-client problems were not specifically mentioned in any part of Canon 5 of the 1969 Code" Wolfram, *supra*, § 7.1.2 at 315, the Model Rules added an entire new rule dealing with former-client conflicts. [MR 1.9] *Id.*, at 316.

■ Moreover, since *Anchor Packing* was written, the Sixth Circuit decided *Dana Corp. v. Blue Cross and Blue Shield*, 900 F.2d 882, 889 (6th Cir.1990), which clearly established a three-part test for disqualification: "(1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired *confidential* information from the party seeking disqualification." *Id.* (emphasis added).

■ In the case at bar, the first condition for disqualification is satisfied because of the imputed relationship between Agrivest II and the shareholders of Schlussel, Lifton; the second is satisfied as well because of the common issue of the financing of the partnership; however, the third provision is not met. The Sixth Circuit used the term "confidential", rather than the word "information," upon which the *Brennan's Inc.* and *Anchor Packing* courts had relied, following the language in the. Code of Professional Conduct. Mr. Harris had a right to know the information learned by his lawyer concerning matters of his business, hence it could never have been confidential with respect to him.

The Motion to Disqualify is DENIED.

SO ORDERED.