Chris CARLSEN, et al.,

v.

J.W. THOMAS.

Civ. A. No. 94–83.

United States District Court,
E.D. Kentucky,
Pikeville.

Dec. 23, 1994.

Jack E. Tolliver, Landrum and Shouse, Lexington, KY, and Steven W. Sanford, Cadwell, Sanford and Deibert, Sioux Falls, SD, for plaintiffs.

Jerry Anderson, Lexington, KY, for defendant.

## MEMORANDUM OPINION AND ORDER

PATTERSON, United States Magistrate Judge.

This matter is before the Court upon the motion of Plaintiffs, Chris J. Carlsen and Ernest G. Carlsen, to disqualify Jerry Anderson and his law firm from acting as counsel for Defendant, J.W. Thomas [Record No. 14]. The parties previously consented to the exercise by the undersigned of full judicial authority in this action pursuant to 28 U.S.C. § 636(c)(1) [Record Nos. 8 and 9], and said motion to disqualify is now ripe for decision.

This action was originally brought by Plaintiffs, on the basis of diversity of citizenship jurisdiction, in the United States District Court for the District of South Dakota, Southern Division. Plaintiffs, residents of South Dakota, seek a declaratory judgment rescinding Plaintiffs' obligation to make further payments to Defendant, a resident of Kentucky, pursuant to the terms of a stock purchase agreement into which the parties entered on or about October 16, 1987 [Record No. 1, Complaint]. Said agreement relates to a business venture of the parties in Breathitt County, Kentucky. After an unsuccessful challenge to the Court's *in personam* jurisdiction over him, Defendant, as part of his answer to the Complaint, also asserted a counterclaim against the Plaintiffs for the remaining payments allegedly due by them under said agreement. The matter proceeded through some discovery in the District Court in South Dakota. By order dated March 22, 1994, the presiding District Judge, upon Defendant's motion for change of venue, transferred this action to this Court.

Following the entry of the parties' stipulations of consent, and in the course of a Fed.R.Civ.P. 16 status/scheduling conference before the undersigned, Plaintiffs' counsel

raised the question of potential disqualification of Defendant's counsel. The Court directed that further pretrial scheduling in this action be deferred pending briefing of and decision by the Court upon an appropriate motion for disqualification.

The gravamen of Plaintiffs' motion to disqualify Jerry Anderson and his law firm[1] from acting as Defendant's counsel in this action is that Anderson has a conflict of interest by virtue of his prior activity as counsel on matters substantially related to this litigation, and further that Anderson is a potential witness in this litigation. The parties' briefs [Record Nos. 15 and 16] argue the applicability of various provisions of the Kentucky Rules of Professional Responsibility to the issues raised. However, a threshold question presented, although not raised by any party, is what are the applicable professional rules or standards which govern the motion to disqualify.

Unlike some federal courts, the United States District Court for the Eastern District of Kentucky (as well as the Western District) has not, by Local Rule or otherwise, expressly adopted any professional standards to govern the conduct of attorneys, such as the forum state's governing rules of professional conduct.[2] The parties' briefs on the subject motion to disqualify assume that the Kentucky Rules of Professional Responsibility, as adopted by the Kentucky Supreme Court (which Rules are a part of the Rules of said Supreme Court, hereinafter cited as "SCR"), govern the issues presented. SCR 3.130(8.4) provides that a lawyer permitted to practice in Kentucky is subject to the disciplinary authority of the Rules of the Supreme Court

of Kentucky although engaged in practice elsewhere. However, Comment 3 to this Rule suggests that federal law must be consulted when an attorney practices in federal court:

> Where the lawyer is licensed to practice law in two jurisdictions which impose conflicting obligations, applicable rules of choice of law may govern the situation. *A related problem arises with respect to practice before a federal tribunal, where the general authority of the states to regulate the practice of law must be reconciled with such authority as federal tribunals may have to regulate practice before them.* (Emphasis added.)

 The ethical standards by which federal courts measure an attorney's professional conduct are standards defined by federal law. *In re Snyder*, 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 2881 n. 6, 86 L.Ed.2d 504 (1985). Furthermore, it has long been recognized that federal courts have the inherent power to evaluate the professional conduct of attorneys practicing before them, and to sanction unprofessional conduct, including disqualification of attorneys. *Insituform of North America, Inc. v. Midwest Pipeliners, Inc.*, 139 F.R.D. 622, 624 (S.D.Ohio 1991). *See also Manning v. Waring, Cox*, 849 F.2d 222 (6th Cir.1988).

 While the *Joint Local Rules for the United States District Courts of the Eastern and Western Districts of Kentucky* do not explicitly adopt a particular set of rules or standards for professional conduct for the attorneys appearing in this Court, Local Rule 3(c) does require that all parties, except

---

1. Anderson indicates in his response [Record No. 13] to the Court's show cause order [Record No. 12] that he is a sole practitioner.

2. All federal courts within the other three states comprising the Sixth Circuit, Michigan, Ohio and Tennessee, have expressly adopted, by local rule, a particular set of professional standards, which is usually the set of professional standards adopted by the forum state. The United States District Court for the Southern District of Ohio has adopted the Model Federal Rules of Disciplinary Enforcement, S.D. Ohio Local Rule 83.4(f), which, in turn, adopts the forum state's Code of Professional Responsibility, *Kitchen v. Aristech Chemical*, 769 F.Supp. 254, 258

(S.D.Ohio 1991), while the Northern District of Ohio has expressly adopted the Code of Professional Responsibility adopted by the Supreme Court of Ohio, "so far as they are not inconsistent with Federal Law." N.D. Ohio Local Rule 1:5.1(b). The Eastern and Western Districts of Michigan have adopted the Michigan Rules of Professional Responsibility. E.D. Mich. L.R. 111.1(d); W.D. Mich. L.R. 17. In Tennessee, the Eastern and Western Districts have adopted Tennessee's Code of Professional Responsibility, E.D. Tenn. L.R. 83.7; W.D. Tenn. L.R. 1, while the Middle District has adopted "the current Code of Professional Responsibility of the American Bar Association." M.D.Tenn.L.R. 1(4).

those appearing in a limited category of cases, shall have local counsel who is admitted to practice in Kentucky and resides or has an office in this state. Moreover, this Court's Local Rules provide for discipline of any Kentucky attorney admitted to the Bar of this Court who has been found "guilty of unprofessional conduct within the meaning of the standards of professional responsibility adopted by the Supreme Court of Kentucky or is guilty of other conduct unbecoming an officer of the Court ..." and provides a procedure for the imposition of such discipline. *Local Rule* 3(b)(2)(E). To be a member of the Bar of this Court, an attorney must be admitted to practice before the Supreme Court of Kentucky and be in good standing with that Court. *Local Rule* 3(a)(1). Accordingly, it would not be unreasonable to conclude that although this Court's Local Rules do not explicitly adopt any particular rules of professional conduct, the sum and substance of this Court's Local Rule 3 governing attorneys who practice before this Court implicitly deem the "standards of professional responsibility adopted by the Supreme Court of Kentucky" as persuasive authority, if not governing standards, for practice before this Court.

 The proper method for a party to alert the Court that a possible violation of professional or ethical standards has occurred is by filing a motion to disqualify counsel. *Musicus v. Westinghouse Electric Corp,* 621 F.2d 742, 744 (5th Cir.1980); *Kitchen v. Aristech, supra,* 769 F.Supp. at 256 (S.D.Ohio 1991).

> However, the ability to deny one's opponent the services of his chosen counsel is a potent weapon. Confronted with such a motion, courts must be sensitive to the competing public interests of requiring professional conduct by an attorney and of permitting a party to retain counsel of his choice. In order to resolve competing interests, the court must balance the interest of the public in safeguarding the judicial process together with the interests of each party. "Motions for attorney disqualification 'should be viewed with extreme caution for they can be misused as a technique of harassment.'"

*Kitchen v. Aristech,* 769 F.Supp. at 256–257 (citations omitted). In this case, Plaintiffs' motion to disqualify was filed in an early phase of the litigation, and discovery has been suspended pending the Court's decision on the motion. As best as can be gleaned from a review of the record of the case while it was pending in the District of South Dakota, a fairly small amount of discovery was conducted in this case prior to its transfer to this Court.

 Thus, another threshold question presented by the subject motion to disqualify, although again not raised by any party, is the adequacy of the record presently before the Court to rule on the motion. Although earlier cases in the Sixth Circuit required the District Court to conduct an evidentiary hearing on a motion to disqualify counsel (as well as providing for interlocutory appeals of the District Court's decision), *see, e.g., Melamed v. ITT Continental Baking Co.,* 534 F.2d 82, 84–85 (6th Cir.1976), *overruled on other grounds,* 592 F.2d 290 (6th Cir.1979), more recent decisions have held that *Melamed's* directive to conduct an evidentiary hearing is not absolute. *In re Petition of Mechem,* 880 F.2d 872, 875 (6th Cir.1989); *General Mill Supply Co. v. SCA Services, Inc.,* 697 F.2d 704, 710 (6th Cir.1982). Rather, as the Court held in *General Mill,* the District Court may decide a disqualification motion in accordance with the decisional standards applied to motions for summary judgment. Fed.R.Civ.P. 56(e). Thus, the Court in *General Mill* directed the District Court to conduct a "factual inquiry" appropriate to the circumstances of the case, and, when appropriate, such inquiry can be conducted on affidavits and other documents of record as would be acceptable under Rule 56(e), so long as the District Court does not undertake to decide disputed issues of fact. 697 F.2d at 710–11.

In this case, Plaintiffs seek disqualification of Defendant's counsel on two grounds: (1) that Defendant's attorney, Jerry Anderson, has a conflict of interest by virtue of his prior activity as counsel for the parties, and (2) that Anderson may be a witness in this litigation. To focus the analysis upon the facts of this case which are relevant to the grounds

asserted in support of Plaintiffs' motion to disqualify, some analysis of the pertinent professional standards is first appropriate. Proceeding from the assumption that the professional standards embodied in the Rules of the Kentucky Supreme Court are most pertinent, for the reasons set forth above, the particular provisions of these Rules as would apply to the subject motion to disqualify shall be reviewed.

Effective January 1, 1990, the Kentucky Supreme Court adopted its own version of the American Bar Association's 1983 Model Rules of Professional Conduct as the professional and disciplinary standard governing attorneys practicing in Kentucky. *See* Eugene R. Gaetke, *Kentucky's New Rules of Professional Conduct for Lawyers*, 78 Ky. L.J. 767 (1989–90). As Professor Gaetke notes, "Kentucky's version of the Model Rules deviates in several substantial and detracting ways from the ABA's version." 78 Ky.L.J. at 768. One such difference appears in Kentucky's Rules governing an asserted conflict of interest regarding a former client. Kentucky's rule, SCR 3.130(1.9), provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> (a) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
>
> (b) *Use* information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known. (Emphasis added.)

By contrast, in a case from the Northern District of Ohio, *Dana Corp. v. Blue Cross and Blue Shield,* 900 F.2d 882 (6th Cir.1990),

the Sixth Circuit enunciated a three-part test for a disqualification motion asserting a conflict of interest as to a former client:

> (1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify;
>
> (2) the subject matter of those relationships was/is substantially related; and
>
> (3) the attorney *acquired* confidential information from the party seeking disqualification.

900 F.2d at 889 (emphasis added). No reported decision discusses Kentucky's apparently more lenient standard that an attorney who has formerly represented a client shall not use information, as opposed to the standard (to "acquire" information) contained in the governing standards expressly adopted by the District Courts in Ohio,[3] Michigan,[4] and Tennessee.[5] The three-part test for determining whether an attorney conflict of interest exists as recited in *Dana Corp v. Blue Cross, supra,* came from the case of *City of Cleveland Electric Illuminating,* 440 F.Supp. 193, 207 (N.D.Ohio 1976), *aff'd.,* 573 F.2d 1310 (6th Cir.1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). The Court in *City of Cleveland* expressly stated that its analysis, and the three-part test devised, was "within the context of the Code of Professional Responsibility." 440 F.Supp. at 207. Beginning in 1969, that Code governed lawyers in Kentucky until January 1, 1990, when Kentucky adopted its modified version of the ABA 1983 Model Rules of Professional Conduct.[6] Other aspects of the applicable Kentucky conflict of interest rule relating to a former client, however, are essentially in accord with the standards from other jurisdictions in the Sixth Circuit.[7]

---

3. See, n. 2, *supra.*

4. *General Elec. Co. v. Valeron Corp.,* 608 F.2d 265 (6th Cir.1979), *cert. den.,* 445 U.S. 930, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Savoy Oil & Gas, Inc. v. Preston Oil Co.,* 828 F.Supp. 34, 35–36 (W.D.Mich.1993); *Anchor Packing Co. v. Pro-Seal, Inc.,* 688 F.Supp. 1215, 1218–19 (E.D.Mich. 1988); see also n. 2, *supra.*

5. *Manning v. Fort Deposit Bank,* 619 F.Supp. 1327, 1329 (W.D.Tenn.1985); *Gilbert v. Knoxville*

*Intl. Energy Exposition,* 547 F.Supp. 53, 54 (E.D.Tenn.1982); see also n. 2, *supra.*

6. Gaetke, 78 Ky.L.J. at 769 n. 12; p. 767 n. 3.

7. *See, e.g.,* the cases cited in notes 4 and 5, *supra,* and *Dana Corp. v. Blue Cross,* 900 F.2d at 889. In contrast to the other Circuits, the Sixth Circuit appears to have approved disqualification of attorneys only in cases involving a conflict of inter-

The other aspect of Plaintiffs' motion to disqualify Mr. Anderson involves Plaintiffs' expectation that he will be a witness at trial. SCR 3.130(3.7), part (a), in pertinent part, prohibits a lawyer from acting "as advocate at a trial in which the lawyer is likely to be a necessary witness except where ... the testimony relates to an uncontested issue ... or ... disqualification of the lawyer would work substantial hardship on the client."

With the above standards as a general framework, and before proceeding to an analysis of the parties' respective contentions on the issues raised, the following facts, as established in the matters presently of record, appear pertinent to the pending motion. Except where otherwise noted expressly, these facts are not in dispute. Parenthetically, it should be noted that the Court's factual summary is for purposes of the present pending motion only, and no portion of this Opinion should be used or relied upon by any party for purposes other than the present motion to disqualify. *World Youth Day, Inc. v. Famous Artists Merchandising Exchange, Inc.*, 866 F.Supp. 1297 (D.Colo.1994).

In early 1986, Roscoe H. ("Spud") Halcomb approached Plaintiff, Chris Carlsen, about investing in a coal mining venture in Kentucky. Plaintiff Chris Carlsen and his father, Plaintiff Ernest G. Carlsen, both attorneys from South Dakota, were shareholders in and controlled Pendleton Enterprises, Inc., a South Dakota corporation. Mr. Halcomb was a resident of South Dakota and employed as an executive with CitiBank. Defendant J.W. Thomas was a shareholder in and President of D & T Developing Co., Inc., a Kentucky corporation. Mr. Halcomb was apparently a shareholder both in D & T Developing Co., Inc., and Pendleton Enterprises, Inc. The two corporations, D & T Developing Co., Inc., and Pendleton Enterprises, Inc., formed D & T Partnership, a Kentucky general partnership.

Although the record on this aspect is not entirely clear, apparently D & T Partnership was formed for the purpose of constructing a recreational facility in Breathitt County, Kentucky, as well as perhaps Wolfe County, Kentucky. As part of the initial construction for the facility, which involved excavating and/or moving sizeable quantities of earth, the partnership planned to remove coal contained within the property. After Halcomb approached Plaintiff Chris Carlsen in early 1986 about investing in the subject venture, Plaintiff Chris Carlsen, along with another investor, borrowed $1,250,000 from the First National Bank of Pipestone, Minnesota, and later Chris Carlsen's father, Plaintiff Ernest Carlsen, made various loans to the project. On September 30, 1986, Mr. Halcomb transferred his stock in Pendleton Enterprises, Inc., his interest in D & T Partnership, and his stock in D & T Developing, Inc., to D & T Developing Co., Inc. The consideration for the transfer of Halcomb's interests to D & T Developing Co., Inc. was a payment of an unspecified sum of money and a promissory note to Halcomb executed by J.W. Thomas.

As part of his efforts to persuade Plaintiffs to invest in the subject venture with him, Defendant Thomas allegedly provided to Plaintiffs a copy of an appraisal prepared by R.W. Crabtree of Lexington, Kentucky at Thomas' request of the Kentucky property which was the subject of the venture. In that appraisal, Mr. Crabtree referred to engineering reports showing 3,000,000 tons of recoverable coal on the property, and appraised the property as having a value of $6,000,000. Plaintiffs subsequently filed suit in this Court, Lexington Civil Action No. 93–110, against Mr. Crabtree alleging that his appraisal was false and fraudulent and that they relied on it to their detriment in investing in the subject venture. The First National Bank of Pipestone was also a plaintiff in that suit. On August 8, 1994, Lexington Civil Action No. 93–110 was dismissed by an agreed order of dismissal.

Insofar as the record before this Court reveals, the earliest documented involvement of Jerry Anderson, as to activities between the parties to this action, is revealed in a deposition of Mr. Anderson taken on an unspecified date in an action in South Dakota State Court brought by D & T Partnership (which is listed in the deposition's case caption as consisting of D & T Development Co.,

est. *See Kitchen v. Aristech, supra,* 769 F.Supp. at 257.

Inc., a Kentucky corporation, and Pendleton Enterprises, Inc., a South Dakota Corporation), the First National Bank of Pipestone, and Chris J. Carlsen against Roscoe H. "Spud" Halcomb. In that deposition, Mr. Anderson testified that his first involvement with Plaintiffs herein started sometime in 1985 or 1986 "when J.W. Thomas, who's a client of mine, came into my office with the plans that he had for a recreational development near Bethany in Wolfe and Breathitt County." [See, Record No. 16, Plaintiffs' Brief in Support of Their Motion to Disqualify Defendant's Counsel and In Reply to Defendant's Response, Exhibit 1, Deposition of Jerry Anderson, pp. 5, 6]. Mr. Anderson testified that Mr. Thomas consulted with Anderson about the plans for the development. [Id., p. 6]. "Some months later," Mr. Anderson was first introduced to "Carlsen," and some other individuals who "had some questions of me concerning becoming involved in a business with J.W. [Thomas]" [Id.]. At some unspecified later time, Chris Carlsen, a banker named Morgan, and another individual who Mr. Anderson could not recall came to Anderson's office [Id.]. Anderson testified: "I think I'd been instructed to work on a partnership for them." [Id., p. 7]. According to Mr. Anderson, he did some of the "paper work" to "originate the partnership." [Id.].

At some unspecified later time, the project had difficulties with the Kentucky Department of Natural Resources, and other agencies, as to regulatory agency authorization to mine coal on the subject property [Id., pp. 7–8]. According to Mr. Anderson's testimony, the partnership had been operating under the assumption that no coal mining permit or other regulatory authorization was necessary for coal to be mined from the subject property, because the coal was being removed as part of the initial construction for the ultimately planned use for the property, as a recreational facility [Id., p. 8]. After the Kentucky Department of Natural Resources issued a stop mining order on the project, Mr. Anderson "was then hired by Chris and the Bank, I guess, Pipestone National Bank ... to see if I can get them back into mining coal" [Id., pp. 7–8]. Mr. Anderson further testified:

So I filed a lawsuit on their behalf in the Breathitt Circuit Court, and obtained an injunction so that they could start mining again. The injunction took care of the State of Kentucky, but it didn't take care of the Office of Surface Mining, or the Department of Interior. The Department of Interior then issued a stop order and it was necessary then to go through an administrative process with the Office of Surface Mining. We did that. The Office of Surface Mining ruled against us. They advised that it would be advisable to obtain permits, both through the State and through OSM. Of course, the permit process is handled through the Department of Natural Resources and OSM, Office of Surface Mining pretty much oversees it. But since we had obtained an injunction against the State, that's why the OSM stepped in. But the Administrative Law Judge ruled against us and we took judicial review to the United States District Court of the Eastern District. We had arguments there. The Magistrate that was assigned to handle the case, Judge Hood, also ruled against us. Then the determination was we were required to make the determination whether or not to appeal to the Sixth Circuit. ... or whether or not just to go ahead and obtain the permits. So that wasn't a legal decision, that was a business decision. And the business decision was made by Chris, and whoever else he took into his confidence for that purpose, to permit the project for the removal of coal rather than to proceed to—on an appeal.

[Id., pp. 8–9].

Mr. Anderson further testified that his next involvement with the project as a lawyer was when "Chris had me deal with the Department of Natural Resources." [Id., p. 9]. Mr. Anderson contacted the Department both personally and by telephone, as well as the Office of Surface Mining [Id.]. Then, at the request of Chris Carlsen, Mr. Anderson set up a meeting with Chris Carlsen, his father, Plaintiff Ernest G. Carlsen, and others, and Mr. Anderson took these individuals to meet with personnel from the Kentucky

Department of Natural Resources. Mr. Anderson further testified:

And from that point on, I didn't have any legal involvement with the Department of Natural Resources. From that point on, pretty much turned it over to Chris. And I think Chris handled it—handled that. [*Id.*, p. 10]. As far as Plaintiffs, Chris J. Carlsen and Ernest G. Carlsen are concerned, Mr. Anderson testified that his only other involvement in the subject project was "when a contract was entered into between J.W. [Thomas] and D & T Development Co., I drafted those agreements, or at least Chris Carlsen and I drafted those agreements of payment. We exchanged ideas on that." [*Id.*, at p. 12]. Mr. Anderson could not recall precisely when the agreement was drafted, but concluded that it was whenever such documents were dated [*Id.*]. Otherwise, said deposition is silent as to any activity on the part of Mr. Anderson in his capacity as attorney on any matters involving Plaintiffs herein, Chris J. Carlsen and/or Ernest G. Carlsen.

In their brief in support of their motion to disqualify [Record No. 16], Plaintiffs contend that in said deposition testimony, "Anderson has admitted that he represented Thomas, Halcomb, D & T and even plaintiff Chris Carlsen on various matters relating to the coal mining venture. At best he is a corporate attorney faced with a dispute between two shareholders. After having acted for the corporation and the plaintiff shareholders, he now wants to represent one of the shareholders on a matter adverse to the others." [Record No. 16, pp. 3–4]. Plaintiffs further assert that "when the project was stalled with regulatory issues, Thomas represented that there were $2 million of coal free of overburden. This representation was conveyed in the March 26, 1987 Anderson letter. This representation led to purchase of defendant's stock in D & T." [*Id.*, p. 2].

In his response to Plaintiffs' motion to disqualify [Record No. 15], Mr. Anderson states that his only involvement in the subject project on behalf of the partnership as its attorney as such were his efforts to have the mining cessation order issued by the Kentucky Cabinet for Natural Resources ("CNR") set aside. Anderson states that as the partnership's attorney, he filed a complaint to accomplish such end in the Breathitt Circuit Court, which issued an injunction lifting the cessation order and prohibited the CNR from further interference with the partnership's efforts to remove and sell coal from the project. [*Id.*, p. 1–2]. Mr. Anderson in his response also essentially echoes his prior deposition testimony as recited above regarding his efforts before the various regulatory agencies and judicial bodies regarding the mining regulation issues. [*Id.*, p. 2].

As to the May 26, 1987 letter sent by Mr. Anderson to Pendleton Enterprises, Inc. [attached as Exhibit 1 to Record No. 15], Mr. Anderson contends that he sent such letter in his capacity as attorney for the partnership in the litigation with the regulatory agencies. As to the alleged misrepresentation in that letter claimed by Plaintiffs, the pertinent statement made by Anderson is: "J.W. tells me there is approximately Two Million Dollars of coal free of overburden." [Record No. 15, Exhibit 1, p. 1].

As to the stock purchase agreement dated October 16, 1987, which is the subject of this litigation [*see* Complaint, Exhibit A], Mr. Anderson states in his response that such agreement was drafted by "Carlsen." [Record No. 15, p. 2]. That reference to "Carlsen" would appear to mean Plaintiff Chris J. Carlsen because Exhibit 2 to said response is a letter dated September 25, 1987, from Chris J. Carlsen transmitting a draft of the stock purchase agreement. Said letter further states: "Please review and call me to discuss the draft." [Record No. 15, Exhibit 2].

In their responsive brief [Record No. 16], Plaintiffs do not dispute Anderson's statement in his response that he was not serving as an attorney for Plaintiffs in connection with the stock purchase agreement itself. Rather, Plaintiffs assert that their decision to enter into the subject stock purchase agreement was the result of "regulatory difficulties" in which Anderson was representing all parties. According to Plaintiffs, these regulatory difficulties provided the impetus for Plaintiffs' purchase of Defendant's stock, and

Anderson in his letter to Pendleton Enterprises, Inc., dated May 26, 1987, suggesting that the regulatory difficulties could be eased or eliminated if Defendant Thomas' company were no longer a partner in the venture was, according to Plaintiffs, "part of a scheme by Defendant to defraud the Plaintiffs and others" [Record No. 16, p. 5]. Although Plaintiffs suggest that Mr. Anderson was merely "an innocent conduit of the misrepresentation," they contend that such activity is "substantially related" to this litigation, in which Plaintiffs seek to rescind their obligation for further payments pursuant to the stock agreement by virtue of alleged fraud and misrepresentations. [*Id.*].

## ANALYSIS

### A. Burden of Proof/Persuasion

Some courts have held that the moving party seeking disqualification of counsel bears the initial burden of persuasion and proof. *In re Dayco Corp. Derivative Securities Litigation,* 102 F.R.D. 624, 628 (S.D.Ohio 1984), *citing, City Consumer Services, Inc. v. Horne,* 571 F.Supp. 965, 970 (D.Utah, 1983); *see also City of Cleveland,* 440 F.Supp. at 207. However, "burdens or presumptions can be shifted to counsel attempting to thwart disqualification." *In re Dayco Corp.,* 102 F.R.D. at 628. The stated basis for allocation of the burden of proof and persuasion to the movant seeking disqualification stems from a party's right to be represented by such counsel as that party chooses:

> An attorney should be disqualified "only when there is 'a reasonable possibility that some specifically identifiable impropriety' actually occurred and, in light of the interest underlying the standards of ethics, the social need for ethical practice outweighs the party's right to counsel of his own choice."

*Kitchen v. Aristech Chemical,* 769 F.Supp. 254, 257 (S.D.Ohio 1991) (*quoting United States v. Kitchin,* 592 F.2d 900, 903 (5th Cir.), *cert. denied,* 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979) (*quoting Woods v. Covington County Bank,* 537 F.2d 804 (5th Cir. 1976)). In *Kitchen v. Aristech,* the court implicitly placed the burden of proof or persuasion upon the parties seeking disqualifica-

tion, finding that the movants failed to establish "that under the circumstances of this case, either their interest in a trial free from prejudice or the public's interest in the scrupulous administration of justice override plaintiffs' interest in being represented by counsel of their choice." 769 F.Supp. at 258. Proceeding from the conclusion that Plaintiffs in this case have at least the initial burden of proving grounds for disqualification of Mr. Anderson, I find that they have failed to sustain that burden, under the applicable professional standards, at this point in the litigation.

Plaintiffs' contention that Mr. Anderson has a conflict of interest requiring disqualification is premised upon SCR 3.130(1.9). There are no reported decisions from the Kentucky State or Federal Courts construing this standard in circumstances pertinent to the case at bar. In this case, it is apparent that Mr. Anderson's activities challenged by Plaintiffs occurred as he was serving as an attorney for D & T Partnership on the "regulatory difficulties," as well as representing Defendant J.W. Thomas personally. Although the record in this case is not a model of clarity on the facts pertinent thereto, it would appear undisputed at this point that Mr. Anderson did not represent Plaintiffs, Chris J. Carlsen and/or Ernest G. Carlsen, personally in connection with such regulatory matters, such that it could be concluded that Plaintiffs ever had an attorney-client relationship with Anderson. Parenthetically, it is noted that both of the Carlsens are attorneys.

Thus, the record before the Court at this point compels the conclusion that in the course of his activities with the various regulatory agencies in an effort to remove further regulatory impediments to the partnership's mining of coal on the subject property, Mr. Anderson was serving as counsel for the partnership itself. The partnership, D & T Partnership, appears to have consisted of two (2) corporations, Pendleton Enterprises, Inc. and D & T Developing Co., Inc. As to the nature of such representation, the formal opinions of the American Bar Association's Committee on Ethics and Professional Re-

sponsibility are instructive.[8] ABA Op. 91–361 (1991) states that "generally, a lawyer who represents a partnership represents the entity rather than the individual partners unless the specific circumstances show otherwise" [*Id.*, at p. 2; WESTLAW Database ABA–ETHOP].

In this case, there is no showing whatsoever that Mr. Anderson at any time represented Plaintiffs individually. It is noted that Mr. Anderson in his deposition commented that "J.W. [Thomas] is a client of mine," [Record No. 16, Deposition of Jerry Anderson, p. 6]. Again, ABA Formal Op. 91–361 is instructive, as it provides that "Representation of the partnership does not necessarily preclude the representation of individual partners in matters not clearly adverse to the interests of the partnership, nor preempt such an individual representation previously undertaken." [*Id.*, at p. 2]. Considerations inherent in dual representation of a partnership and a partner include "the lawyer's duties of fidelity, candor and independent professional judgment ... [and] the ability to maintain the confidentiality of communications from an individual partner or made on behalf of the partnership." [*Id.*, at pp. 2–3].

In this case, it appears that Defendant J.W. Thomas, individually, was first a client of Mr. Anderson, that Mr. Anderson drafted the paperwork "to originate the partnership," and subsequently represented the partnership on coal mining regulatory matters resulting from the partnership's mining of coal. In this regard, said ABA Opinion is pertinent, as it directs consideration of the following factors:

whether the lawyer affirmatively assumed a duty of representation to the individual partner, whether the partner was separately represented by other counsel when the partnership was created or in connection with its affairs, whether the lawyer had represented an individual partner before undertaking to represent the partnership, and whether there was evidence of

reliance by the individual partner on the lawyer as his or her separate counsel, or of the partner's expectation of personal representation.

[*Id.*, at p. 3]. In this case, there is no evidence of record that Mr. Anderson ever represented Plaintiffs individually in any matters even remotely related to the subject litigation. Rather, the matters of record indicate that Mr. Anderson simply represented the partnership, which consisted of two (2) corporations, and Defendant J.W. Thomas individually. In a similar situation involving the Michigan version of Model Rule 1.9, which is quite similar to Kentucky's corresponding standard, SCR 3.130(1.9), the District Court held that such rule simply did not apply:

A lawyer who represents both a partner and a partnership at a time when their interests are not adverse is not in the same situation as a lawyer who is representing two unrelated clients. The attorney who owes ethical obligations to two clients is never in a good position. However, when those clients owe each other a fiduciary duty and must disclose all information to each other as part of that duty, and the attorney is performing work for both parties during the same time period on partnership business, then the attorney for the partnership should not have a duty of confidentiality concerning partnership matters with regard to the partner.

*Harris v. Agrivest Ltd. Partnership II*, 818 F.Supp. 1035, 1039 (E.D.Mich.1993). Thus, despite Plaintiffs' contention that the regulatory matters in which Mr. Anderson represented the partnership are "substantially related" to the present litigation, there is no showing in the record herein that while Mr. Anderson was so representing the partnership, as well as J.W. Thomas personally, Mr. Anderson was serving as counsel for either or both Plaintiffs personally, much less that Mr. Anderson acquired any sort of confidential information from Plaintiffs that would have any bearing upon the present litigation.

---

8. *See Kitchen v. Aristech*, 769 F.Supp. at 258 ("Since questions of ethics in federal cases are ultimately questions of federal law, the Court is guided by federal case law, as well as the American Bar Association's comments to its Model Rules of Professional Conduct and the policies underlying the particular ethical rule at issue.").

As the Court in *Harris* noted, the essential rationale underlying Michigan's Rule 1.9 (which is somewhat stricter, dealing with information "acquired," whereas Kentucky proscribes the "use" of confidential information), is that

> "there is a public interest in assuring every client that communications to a lawyer will not be used adversely in the lawyer's later work. Situations that create a realistic risk that that will occur are those in which the former-client conflict rules should require disqualification."

*Harris v. Agrivest*, 818 F.Supp. at 1039, *quoting* Charles W. Wolfram, *Modern Legal Ethics* § 7.4 at 360 (Student Ed.1986). There being absolutely no showing by Plaintiffs, who are the only ones who would, other than Mr. Anderson, be in possession of such information, that Mr. Anderson acquired any sort of confidential information from either or both Plaintiffs in the course of Mr. Anderson's representation of the partnership in the regulatory matters, much less any showing by Plaintiffs, within the literal terms of Kentucky's governing rule, SCR 3.130(1.9)(b), requiring "use" of confidential information, Plaintiffs have failed to show that they actually were, individually, former clients of Mr. Anderson. Accordingly, I must find that the former-client disqualification rules have no application to the circumstances of this case, and therefore on this basis, Plaintiffs' motion for disqualification must be denied.

Similarly, Plaintiffs have failed to demonstrate, nor does the record herein at all suggest, any basis upon which to disqualify Mr. Anderson at this time because he is a potential witness in this case. The pertinent Kentucky professional standard, SCR 3.130(3.7)(a) provides, in pertinent part, that "A lawyer shall not act as advocate at trial in which the lawyer is *likely* to be a necessary witness except where: (1) the testimony relates to an uncontested issue." (Emphasis added). Plaintiffs incorrectly attempt to place the burden of proof and persuasion upon Mr. Anderson on this issue: "Plaintiffs do not know what Defendant will say; and of course the two people who would know that best would be Anderson and Defendant. Ac-

cordingly, even if an admission by Anderson would put Anderson in the 'unnecessary' category, Anderson has not proved that the exception applies." [Record No. 16, p. 3]. From the record developed thus far in this case, it is apparent that Mr. Anderson, on behalf of Mr. Thomas, communicated information to Pendleton Enterprises, Inc., information that Mr. Anderson states in his letter dated May 26, 1987, was simply information that Mr. Thomas provided to Mr. Anderson. While Plaintiffs contend that such information was a material misrepresentation that is one of the bases on which they seek to rescind their obligations under the subject stock purchase agreement, Plaintiffs have failed to demonstrate, at this time, that Mr. Anderson, as SCR 3.130(3.7)(a) expressly provides, "is *likely* to be a necessary witness" herein, much less that any testimony which he might give would relate to a contested issue in this case. *World Youth v. Famous Artists*, 866 F.Supp. at 1301–02. If such a scenario subsequently arises in this case, or appears likely to arise, Plaintiffs can and should raise the matter again with the Court. Meanwhile, Mr. Anderson must assess, as part of his ethical obligations as counsel for Defendant, whether, as a practical matter, he should consider voluntarily withdrawing at this time, to foreclose the possibility as a later stage in the litigation that he might have to withdraw as counsel for Defendant, which could present a possible hardship to Defendant. At this time, however, for this Court to sever the attorney-client relationship based on what *might* occur in the course of litigation is too severe a sanction. In the words of one court, "disqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir.1982).

For these reasons, and the Court being otherwise sufficiently advised,

IT IS ORDERED that Plaintiffs' motion to disqualify [Record No. 14] be, and the same hereby is, OVERRULED, but without prejudice to the right of Plaintiffs to file a future

motion for disqualification at a subsequent point in this litigation.