930 A.2d 328

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

**v.**

**William L. SISKIND.**

**Misc. Docket AG No. 22 Sept.Term, 2006.**

Court of Appeals of Maryland.

Aug. 24, 2007.

---

Raymond A. Hein, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel for Atty. Grievance Com'n of Maryland), for Petitioner.

Arnold M. Weiner (Norman L. Smith of Fisher & Winner), Baltimore, MD, for Respondent.

Argued Before BELL, C.J., RAKER, CATHELL,* HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER (Retired, specially assigned), JJ.

---

* Cathell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

48

**HARRELL, Judge.**

The Attorney Grievance Commission ("Petitioner"), acting through Bar Counsel, filed with this Court a Petition for Disciplinary or Remedial Action (the "Petition") against William L. Siskind ("Respondent"), alleging violations of the Maryland Rules of Professional Conduct ("MRPC") in connection with his transactions involving a business associate named Frank Zokaites. Respondent is charged with violations of MRPC 1.4 (Communication),[1] 1.7 (Conflict of Interest: General Rule),[2] 1.8 (Conflict of Interest: Prohibited Transactions),[3]

---

1. The pre–1 July 2005 version of Rule 1.4, which was in effect at the time of its alleged violation by Respondent, stated:

 (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

 (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

2. The pre–1 July 2005 version of Rule 1.7 stated:

 (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

 (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

 (2) each client consents after consultation.

 (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

 (1) the lawyer reasonably believes the representation will not be adversely affected; and

 (2) the client consents after consultation.

 (c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved.

3. The pre–1 July 2005 version of Rule 1.8, in pertinent part, stated:

 (a) A lawyer shall not enter into a business, financial or property transaction with a client unless:

 (1) the transaction is fair and equitable to the client; and

 (2) the client is advised to seek the advice of independent legal counsel in the transaction and is given a reasonable opportunity to do so.

1.9 (Conflict of Interest: Former Client),[4] 1.15 (Safekeeping of Property),[5] 8.1 (Bar Admissions and Disciplinary Matters),[6] and 8.4(c) (Misconduct).[7] The case was referred to the Honorable Barry G. Williams of the Circuit Court for Baltimore City to conduct an evidentiary hearing and render findings of fact and recommended conclusions of law.

At the hearing before Judge Williams on 23 January 2007, Petitioner abandoned all of the violation allegations contained in the Petition save those of MRPC 1.9 and 8.4(c). On 8 March 2007, Judge Williams, in his written findings and conclusions, concluded that Respondent violated MRPC 1.9 and 8.4(c).

---

4. The pre–1 July 2005 version of Rule 1.9, in pertinent part, stated:
 A lawyer who has formerly represented a client in a matter shall not thereafter:
 (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
 (b) use information relating to the representation to the disadvantage of the former client except as these Rule 1.6 would permit with respect to a client or when the information has become generally known.

5. The pre–1 July 2005 version of Rule 1.15, in pertinent part, stated:
 (d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

6. The pre–1 July 2005 version of Rule 8.1, in pertinent part, stated:
 An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
 (a) knowingly make a false statement of material fact.

7. The pre–1 July 2005 version of Rule 8.4(c) provided:
 It is professional misconduct for a lawyer to:
 \* \* \*
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

### I. The Hearing Judge's Findings of Fact and Conclusions of Law

Judge Williams rendered the following facts and conclusions of law, purporting to be based on clear and convincing evidence.

### A. Respondent's Former Representation of 101 Charles, LLC (MRPC 1.9)

On 15 February 2004, Respondent filed a complaint in the Circuit Court for Baltimore City "individually and as attorney for Transamerican Commercial, Ltd.," ("TCL"), against 101 Charles, LLC ("101 Charles") and Zokaites, seeking to enforce the terms of a contract executed on 15 September 2004 which conveyed ownership of 101 Charles from TCL to Zokaites. The entity, 101 Charles, was formed in July 2002 for the purpose of renovating and marketing an office building in downtown Baltimore known as the Jefferson Building.[8]

Despite his protestations to the contrary, Respondent formerly represented 101 Charles as its attorney from the entity's inception in July 2002 until 15 September 2004. In addition to serving as 101 Charles's general counsel, Respondent performed significant legal work on behalf of 101 Charles. In July 2002, Respondent entered into a Purchase Agreement and Addendum with Zokaites to transfer the Jefferson Building from Respondent to the newly formed 101 Charles. That Purchase Agreement indicated that "[Respondent] will provide an attorney's letter of title to Zokaites and [101 Charles]. [Respondent] will not charge Zokaites or [101 Charles] *any fees for legal work performed in connection with the Property and this Agreement.*" (emphasis added). Further, Respondent prepared a deed conveying the Jefferson Building from TCL to 101 Charles.

---

8. At the time 101 Charles was formed, Zokaites obtained an indirect ownership interest in the Jefferson Building by virtue of his 50% stake in 101 Charles, which held the deed to the building. In 2004, TCL sold its 50% stake in 101 Charles to Zokaites, making him the sole owner of the entity controlling the building.

Because Respondent formerly represented 101 Charles, the hearing judge determined that Respondent violated MRPC 1.9 when he initiated the contract suit on 15 February 2005 against his former client. The lawsuit he filed on behalf of TCL and himself involved the same or a substantially related matter to the 15 September 2004 transference of TCL's member shares in 101 Charles to Zokaites because the suit sought to enforce the terms of the contract effectuating the transfer. According to the hearing judge, because Respondent indirectly owned and controlled 50% of 101 Charles through his ownership of TCL, he "necessarily had confidential information regarding 101 Charles." Further, there existed a substantial risk that Respondent disclosed and used confidential information in filing suit against his former client, 101 Charles. Finally, TCL's and Respondent's pecuniary interests were materially adverse to those of 101 Charles because, if the Respondent's lawsuit was successful, his former client could have been required to pay over $300,000 in damages to Respondent and TCL.

### B. Zokaites's Loan to TCL (MRPC 8.4(c))

In March 2002, Zokaites loaned $151,550.00 to Respondent to enable Respondent to satisfy an architect's lien on a New Mexico investment property known as La Mesa Race Track, which is owned partially by Respondent. The Collateral Agreement for the March 2002 loan stated, "Zokaites has agreed to lend the total sum of $151,550.00 *to [Respondent]* in accordance with the terms of a Note entered into *by [Respondent]*." (emphasis added). The Collateral Agreement made two other references to Respondent as a party to, and recipient of, the loan. Respondent understood fully the Collateral Agreement. Contradicting the Collateral Agreement, however, was a Promissory Note dated 20 March 2002 indicating that the borrower of the $151,550.00 was TCL. The Promissory Note was drafted and signed by Respondent on behalf of TCL. Further, a mortgage, dated 4 April 2002, refers to the $151,550.00 loan, stating that TCL is the mortgagor. The

mortgage was drafted and signed by Respondent on behalf of TCL.

Respondent, when drafting and signing legal documents, generally uses his name and TCL interchangeably. Thus, it was not a mistake or oversight when Respondent used his own name as the borrower in the Collateral Agreement. Another example of this synonymous use was found in the Purchase Agreement, dated 9 July 2002, of the Jefferson Building in Baltimore. In the Purchase Agreement, Respondent described himself as the owner of the Jefferson Building, but the deed later conveying the building to 101 Charles listed TCL as the owner. The deed was signed by Respondent on behalf of TCL. At other times, however, Respondent was more precise in using his name or that of TCL. For example, Respondent, in drafting the Addendum to the Purchase Agreement, appeared to appreciate the legal ramifications of using his name at certain points and that of TCL at others.

Furthermore, Respondent made inconsistent statements about the identity of the loan recipient regarding the New Mexico property. In a 20 May 2005 letter to Bar Counsel, Respondent stated, "*I* negotiated with Zokaites" and "*I secured the loan by a promissory note signed by me, individually.* As a bonus for lending me the money I promised Zokaites a 2% interest in my 50% interest either in the sale of La Mesa Track, or the same interest in the net income produced by the track if my partner of 50% and I developed it." (emphasis added). In a letter to Bar Counsel several months later, however, Respondent characterized the same transaction as a loan to La Mesa, LLC. In that same letter, Respondent indicated that $126,500.00 of the loan was deposited into a bank account controlled by Respondent at Carrollton Bank and, further, that some $13,668.51 not used to pay off the lien on the race track and satisfy legal fees, "per agreement of Mr. Zokaites, was to be used *as [Respondent] saw fit.*" (emphasis added).

Accordingly, Respondent personally borrowed money from Zokaites. In a 5 April 2004 deposition of him taken in the

course of his personal bankruptcy case, however, Respondent stated, "I have not personally borrowed any money from Mr. Zokaites." In responses to discovery in the present disciplinary matter, Respondent indicated that his sworn answers at the deposition in the bankruptcy matter were not accurate or true. Contrary to his assertions that he was mistaken at the deposition, Respondent knowingly testified falsely under oath when he stated that he never personally borrowed money from Zokaites. This knowingly false testimony violates MRPC 8.4(c) according to *Attorney Grievance Commission v. White*, 354 Md. 346, 367, 731 A.2d 447, 459 (1999).

### C. Respondent's Assertion that Zokaites was his Client (MRPC 8.4(c))

At the 5 April 2004 deposition in his personal bankruptcy case, Respondent answered a question seeking the identification of Zokaites by replying, "He is a client of mine and my son's, and I have some business with him." Respondent thereafter in the deposition invoked attorney-client privilege as the basis for refusing to answer inquiries whether Zokaites loaned him money.

Although Respondent was aware that his deposition testimony was under oath, he now asserts that his testimony was incorrect and the result of confusion related to his advanced age. This explanation was found unsatisfactory and incredible by Judge Williams in light of the fact that, during the hearing on the Petition, Respondent was otherwise able to provide detailed and thorough descriptions of the complex business transactions he structured with Zokaites and others. Respondent's excuse is also undermined by the complicated legal and business documents drafted and/or signed by him. Therefore, Respondent failed to prove his defense of mistake by a preponderance of the evidence. It is undisputed that Respondent never served as Zokaites's attorney. Thus, Respondent knowingly testified falsely under oath in violation of MRPC 8.4(c) when he indicated that he was Zokaites's attorney.

## II. Standard of Review

The standard of review for attorney disciplinary matters is succinctly summarized in *Attorney Grievance Commission v. Zdravkovich*, 375 Md. 110, 825 A.2d 418 (2003):

This Court exercises " 'original and complete jurisdiction for attorney disciplinary proceedings in Maryland,' and conducts 'an independent review of the record.' " "In conducting that review, we accept the hearing judge's findings of fact as prima facie correct unless shown to be 'clearly erroneous,' and we give due regard to the hearing judge's opportunity to assess the credibility of witnesses." "As to the hearing judge's conclusions of law," however, " 'our consideration is essentially de novo.' "

375 Md. at 126, 825 A.2d at 427 (citations omitted).

In reaching the findings of fact to which we bestow a good measure of deference in our review, the hearing judge must "apply the clear and convincing standard of proof when weighing the evidence." *Attorney Grievance Comm'n v. Ward*, 394 Md. 1, 16, 904 A.2d 477, 486 (2006) (citing *Attorney Grievance Comm'n v. Harris*, 366 Md. 376, 389, 784 A.2d 516, 523–24 (2001)); Maryland Rule 16–757(b). "The clear and convincing standard of proof lies somewhere between a preponderance of evidence standard, which is generally applied to civil cases, and beyond a reasonable doubt standard, which is applied to most crimes." *Ward*, 394 Md. at 16, 904 A.2d at 486 (citing *Harris*, 366 Md. at 389, 784 A.2d at 523). The attorney subject to the disciplinary hearing may assert "an affirmative defense or a matter of mitigation or attenuation[, but] has the burden of proving the defense or matter by a preponderance of the evidence." Maryland Rule 16–757(b); *Attorney Grievance Comm'n v. Guida*, 391 Md. 33, 50–51, 891 A.2d 1085, 1095 (2006).

## III. Respondent's Exceptions

After receiving three extensions of the filing deadline from us, Respondent filed exceptions to Judge Williams's findings of fact and conclusions of law on 14 May 2007. Stated generally,

Respondent advanced the following exceptions: (1) the hearing judge found erroneously that Respondent knowingly made a false statement at the bankruptcy deposition by asserting that he was Zokaites's attorney; (2) Respondent's assertion of attorney-client privilege at his bankruptcy deposition did not violate MRPC 8.4(c) because the assertion did not prevent the deposing attorney from acquiring the information he sought; (3) the hearing judge found erroneously that Respondent made a false statement at the deposition when he testified that he had not borrowed personally any funds from Zokaites; (4) the hearing judge wrongfully did not require Bar Counsel to prove by clear and convincing evidence that Respondent *intended* to testify falsely at the deposition; (5) the hearing judge, once convinced that the Respondent made a false statement, incorrectly placed the burden on Respondent to prove that his misstatement was an innocent one; (6) the hearing judge failed to find explicitly that Respondent intended to make false statements;(7) the hearing judge concluded erroneously that there was a "substantial relationship" between Respondent's former representation of 101 Charles and the 2004 transaction which served as the basis for Respondent's contract action against 101 Charles, (8) the hearing judge neglected to find that 101 Charles waived the conflict of interest presented by Respondent's representation of TCL by failing to object to Respondent's appearance; and (9) the hearing judge erred by not recognizing that former business partners who are having a falling out and sue each other have no right of confidentiality as to their previous communications with each other or their lawyer.

### A. Respondent's Former Representation of 101 Charles, LLC (MRPC 1.9)

#### 1. No Substantial Relationship

Respondent first argues that his representation of 101 Charles was limited only to creating the deed, articles of incorporation, and an opinion letter related to the transfer of a 50% interest in 101 Charles to Zokaites. Further, Respondent asserts that Jeffrey Siskind (his son, who is an attorney

in Florida) and Zokaites prepared and signed the later Purchase Agreement, executed on 15 September 2004, which transferred TCL's member shares in 101 Charles to Zokaites. Respondent also disputes the hearing judge's finding that Respondent drafted both the 20 March 2002 Promissory Note for the La Mesa loan made by Zokaites and the Addendum to the 2004 Purchase Agreement. This limited involvement in the affairs of 101 Charles, in the opinion of Respondent, is not substantially related to the litigation for which Respondent represents TCL against 101 Charles.

In support of this position, Respondent argues that the hearing judge misapplied this Court's standard, articulated in *Gatewood v. State*, 388 Md. 526, 880 A.2d 322 (2005), for determining whether two legal matters are substantially related for the purposes of conflict of interest analysis. In particular, Respondent contends that Bar Counsel failed to prove that there was a substantial risk that information confidential to 101 Charles was utilized by Respondent in his later suit against 101 Charles. As an illustration, Respondent relies upon *Gatewood* for the proposition that it was error to conclude that there was a substantial relationship, because neither Bar Counsel nor the hearing judge undertook a close examination of the facts relating to Respondent's previous representation of 101 Charles to determine if Respondent was using confidential information. In *Gatewood*, the trial judge, once alerted to a possible conflict in a criminal case, quizzed the allegedly conflicted prosecuting attorney to satisfy himself that the attorney could not recall confidential information gained from prior representation of the then-defendant while serving as his public defender in an earlier, unrelated matter. 388 Md. at 532–36, 880 A.2d at 325–28.

We do not accept, similar to the hearing judge's view, Respondent's bald assertion that he did not compose the 2004 Purchase Agreement. The hearing judge made a finding of fact, based on his evaluation of the evidence and observation of Respondent as a witness, that Respondent performed legal work for 101 Charles, including the drafting and execution of

the Purchase Agreement. The hearing judge's findings are supported by the requisite quantum of proof.

The pertinent consideration here is whether Respondent's previous representation of 101 Charles is "substantially related" to the contract action Respondent filed against 101 Charles on behalf of TCL. As we said in *Gatewood*, " 'substantially related' embraces consideration of circumstances where the same issue is litigated, albeit for a different client, if there is a substantial risk that confidential communications between the attorney and his or her former client may be disclosed or utilized in a material manner prejudicial to the former client." 388 Md. at 544, 880 A.2d at 332–33.

By operation of law, Respondent is assumed to possess confidential information pertaining to 101 Charles because he served as the entity's attorney. *Buckley v. Airshield Corp.*, 908 F.Supp. 299, 306 (D.Md.1995) (quoting *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F.Supp. 724, 731 (E.D.Va.1990)) ("It is well settled that once an attorney-client relationship has been established, an irrebuttable presumption arises that confidential information was conveyed to the attorney in the prior matter."). This presumption arises in the present case because of the level of Respondent's involvement with 101 Charles's affairs. Respondent's intimate involvement in the preparation of various legal and business documents relating to 101 Charles, from the moment of its inception until the transaction which made Zokaites its sole owner, demonstrates that Respondent possessed significant knowledge of its affairs, arguably more than anyone. His guiding hand was involved in every legal transaction affecting 101 Charles. He recounted detailed information regarding the entity for purposes of this and other litigation. It is beyond reasonable contention that Respondent was equipped with confidential information bearing on the contract action he initiated against his former client. Further, Respondent's recall, for purposes of his defense at the hearing on this disciplinary action, of details relating to the transactions affecting 101 Charles supports the

notion that such information still resided within Respondent's memory at the time he filed suit against his former client.

Accordingly, we are unmoved by Respondent's argument that the hearing judge failed to make express findings as to what specific confidential information regarding 101 Charles Respondent possessed and used. Respondent appears to fault the hearing judge for not querying Respondent in the same probing manner as the trial judge did for the Public Defender, turned State's Attorney, who previously defended, in another case, the same defendant he was now prosecuting. *Gatewood*, 388 Md. at 532–36, 880 A.2d at 325–28. Interrogation is not required in every case. *Gatewood* does not stand for the proposition that judges themselves must conduct an exhaustive inquisition of potentially conflicted attorneys. The facts in *Gatewood*, rather, were unique. There the trial judge was moved to pose questions to the potentially conflicted attorney as the result of two oral motions to disqualify the attorney. In other contexts, all that may be required is that a judge, in the course of his or her deliberations, "examine the nature and scope of the prior and present representation and determine whether confidences might have been disclosed in the course of the prior representation which could be relevant to the present action." *Buckley*, 908 F.Supp. at 304–05. It is clear to us that Judge Williams observed the relevant considerations on the record before him and we find no error infecting his conclusion.

### 2. Any Confidentiality Was Destroyed by the Contract Suit

■ Respondent stakes out an alternative position where he argues that any confidential information he may have attained by virtue of formerly representing both 101 Charles and TCL may be wielded against 101 Charles in a subsequent suit against it by TCL as represented by Respondent. This position purportedly is supported by a principle of law known variably as the "common interest doctrine" or the "joint representation doctrine." As this doctrine goes, confidential information divulged by co-clients to a shared attorney loses its confidential nature when litigation arises between the

former co-clients as the result of a breakdown in their common interest. *See In re Matter of a Grand Jury Subpoena,* 406 F.Supp. 381, 393 (S.D.N.Y.1975); *see also Hillerich & Bradsby v. MacKay,* 26 F.Supp.2d 124, 127 (D.D.C.1998); *Opus Corp. v. IBM Corp.,* 956 F.Supp. 1503, 1506 (D.Minn. 1996); *Polycast Tech. Corp. v. Uniroyal, Inc.,* 125 F.R.D. 47, 50 (S.D.N.Y.1989). Respondent reasons that, because the information he attained in the process of representing both TCL and 101 Charles underwent the above-mentioned transmogrification from confidential to non-confidential when TCL initiated a suit against 101 Charles, the matters are no longer substantially related. Accordingly, without a substantial relationship between the previous concurrent representation and the contract claim, any utilization by him of information gained from the concurrent representation would not present a conflict of interest. The argument is clever, but incorrect.

■ We have agreed already with the hearing judge's conclusion that Respondent possessed confidential information relating to 101 Charles, obtained from his previous representation of the entity. Respondent's alternative argument, however, gainsays the confidential nature of that information because the attorney-client privilege that existed between each of 101 Charles and TCL and their attorney, Respondent, was destroyed as a result of the subsequent contract litigation. This argument, however, fails because, for purposes of an attorney discipline proceeding involving a conflict with a former client's interests, the existence of an attorney-client privilege does not matter. Respondent overlooks a lawyer's broader ethical duty to avoid representing conflicting interests, which supercedes the more narrow evidentiary concern of attorney-client privilege. *See In re Criminal Investigation No. 1/242Q,* 326 Md. 1, 5, 602 A.2d 1220, 1222 (1992) ("[T]he rule of confidentiality is broader than the attorney-client privilege."). Other jurisdictions encountering Respondent's species of argument have expressed the same reason for rejecting it.

**60**

The U.S. Court of Appeals for the Fifth Circuit was presented with an argument similar to Respondent's in an attorney disqualification case, *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168 (1979). *Brennan's Inc.* involved a dispute between two camps of a federated chain of family-run restaurants spread across various Southern states. 590 F.2d at 170. Prior to the dispute, all of the family members were stockholders and directors in the plaintiff corporation, which controlled the New Orleans branch of the restaurant chain, and some were stockholders and directors for the defendant corporations controlling other chain locations in Texas, Georgia, and other parts of Louisiana. *Id.* For a period of approximately two years, an attorney named Wegmann served as general counsel for the family businesses. *Id.* In that time, he prosecuted the applications for federal registration of several service marks. *Id.* A later rift in the family caused the division of the restaurants into two camps and Wegmann decided to continue his representation of the defendants and severed his connections to the plaintiff. *Id.* Subsequent to the division of the several family restaurants among the feuding family members, a legal dispute arose over the use of the service marks registered in the plaintiff's name. *Brennan's, Inc.*, 590 F.2d at 170–71. Wegmann represented the defendant corporations in the suit filed by his former client as plaintiff and submitted a counterclaim. *Brennan's, Inc.*, 590 F.2d at 171. The plaintiff moved to disqualify Wegmann based on a conflict of interest, which motion the trial court granted. *Id.* The corporate defendants appealed that ruling, arguing that the joint representation prevented the formation of any confidences between the parties and Wegmann, thus obviating for Wegmann any ethical duty not to represent the defendants against his former client. *Id.*

The *Brennan's, Inc.* court rejected the defendants' argument. The court began by reciting the familiar prohibition against representing any interest materially adverse to that of a former client when the matters are substantially related, a rule premised on the presumption that the former representation involved the disclosure of the client's confidences. *Id.*

Contrary to the defendants' assertion that such a presumption does not arise in joint representation scenarios, the court noted that "[t]he fundamental flaw in defendants' position is a confusion of the attorney-client evidentiary privilege with the ethical duty to preserve a client's confidences." *Brennan's, Inc.,* 590 F.2d at 172. "[T]he ethical duty is broader than the evidentiary privilege," encompassing the protection not only of confidential information, but "all knowledge acquired from client." *Id.* The court stressed the fiduciary duty that is formed when a client places his or her trust in an attorney and the obligation not to betray that trust. "A client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the client in the same matter." *Id.* Finally, the court opined that "[t]he need to safeguard the attorney-client relationship is not diminished by the fact that the prior representation was joint with the attorney's present client." *Id.*

Several jurisdictions have acknowledged the wisdom of the reasoning in *Brennan's, Inc. See, e.g., Exterior Sys., Inc. v. Noble Composites, Inc.,* 210 F.Supp.2d 1062, 1071–72 (N.D.Ind.2002); *Lawyer Disciplinary Board v. McGraw,* 194 W.Va. 788, 461 S.E.2d 850, 861 (1995); *X Corp. v. Doe,* 805 F.Supp. 1298, 1307–08 (E.D.Va.1992); *Prisco v. Westgate Entm't, Inc.,* 799 F.Supp. 266, 270 (D.Conn.1992); *Koch v. Koch Indus.,* 798 F.Supp. 1525, 1535 (D.Kan.1992); *Anchor Packing Co. v. Pro–Seal, Inc.,* 688 F.Supp. 1215, 1217–18 (E.D.Mich.1988); *St. Albans Fin. Co. v. Blair,* 559 F.Supp. 523, 526, *aff'd,* 725 F.2d 670 (3d Cir.1983).

Even courts not relying on *Brennan's, Inc.* arrive at the same conclusion. In *Knight v. Ferguson,* 149 Cal.App.4th 1207, 57 Cal.Rptr.3d 823 (2007), two parties, who eventually became associates in a restaurant venture, had been represented concurrently by an attorney named Wideman. One of the soon-to-be partners, Knight, consulted with Wideman, who was already the Fergusons' attorney, regarding the formation of a corporation to run a restaurant. *Knight,* 57 Cal.Rptr.3d at 826. Wideman was also retained to handle a dispute Knight had with a party sought originally as her associate in

the venture, but who backed out. *Id.* Knight invited the Fergusons to substitute for the balking erstwhile associate, which invitation was accepted. *Id.* At some point subsequent to the formation of the business (with Wideman's assistance), Knight sued the Fergusons for breach of contract. *Id.* Although initially represented by other counsel, the Fergusons retained Wideman to pursue their cross-complaint against Knight. *Id.*

The California Court of Appeals held that Wideman should be disqualified from representing the Fergusons in the contract action against Knight because of the conflict of interest involved. *Knight,* 57 Cal.Rptr.3d at 829. Wideman represented jointly both parties, now adversaries, in forming the business venture. *Knight,* 57 Cal.Rptr.3d at 828. When a conflagration regarding the business venture erupted between the parties and litigation ensued, Knight objected to Wideman's representation of the Fergusons. *Knight,* 57 Cal.Rptr.3d at 826. The Fergusons, pleading essentially the same argument proffered by Respondent here, argued that no conflict was present because the previous joint representation destroyed any attorney-client privilege that existed, and thus any confidentiality concerns disappeared. *Knight,* 57 Cal. Rptr.3d at 828. The California court rejected that argument, declaring that,

> even if the attorney-client evidentiary privilege does not apply, the result does not change. "[T]he pertinent issue is the propriety of an attorney's representation adverse to a former client. Our courts have distinguished the rule against representing conflicting interests from the attorney-client evidentiary privilege noting that the former is broader than the latter." Thus, even where the issue of disclosure of privileged information is absent, an attorney is properly disqualified for violating the separate and independent duty not to represent conflicting interests.

*Knight,* 57 Cal.Rptr.3d at 829 (quoting *W. Cont'l Operating Co. v. Natural Gas Corp.,* 212 Cal.App.3d 752, 261 Cal.Rptr. 100, 105 (1989)). The *Knight* court further elucidated that

[t]he evidentiary privilege and the ethical duty not to disclose confidences both arise from the need to encourage clients to disclose all possibly pertinent information to their attorneys, and both protect only the confidential information disclosed. The duty not to represent conflicting interests ... is an outgrowth of the attorney-client relationship itself, which is confidential, or fiduciary, in a broader sense. Not only do clients at times disclose confidential information to their attorneys; they also repose confidence in them. The privilege is bottomed only on the first of these attributes, the *conflicting-interests* rule, on both.

*Knight,* 57 Cal.Rptr.3d at 829 (quoting *W. Cont'l Operating Co.,* 261 Cal.Rptr. at 105–06). Put another way, there is more to the attorney-client relationship than the mere words exchanged between client and counsel. There is a more fundamental aspect of the relationship that is the sense of trust and confidence a client invests in his or her chosen legal counselor and representative. In cases involving alleged ethical violations, this fiduciary duty is of paramount concern.

Common sense also demonstrates the impropriety of Respondent's action. In the process of crafting a clever argument to prove that no conflict existed because the confidential information lost its confidential value, Respondent loses sight of a fundamental test by which these questions ought to be resolved. The Comment to MRPC 1.9 reads, in relevant part: "The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." We are of the opinion that when Respondent filed a suit sounding in contract against a former client, an entity he created, over a business transaction he helped construct by creating the relevant documents now central to the contract suit, he effectively changed sides.

 The fact that Respondent joined the side of his former client's former business partner (who he also represented in the disputed transaction) bodes worse, not better, for Respondent. Were we to accept Respondent's position on

this question, we would be approving precisely the type of betrayal of confidence and fiduciary duty the Maryland Rules of Professional Conduct are designed to protect. *See Hughes v. McDaniel,* 202 Md. 626, 633, 98 A.2d 1, 4 (1953) ("[T]he confidential and fiduciary relationship enables an attorney to exercise a very strong influence over his client and often affords him opportunities to obtain undue advantage by availing himself of the client's necessities, credulity and liberality."). It does not take too vivid an imagination to perceive a situation where an attorney represents two parties who become embroiled in a controversy over a business transaction with one another. Under Respondent's view of what constitutes a conflict of interest, the attorney would be permitted to choose to represent the party he or she, in his or her professional judgment, stood the best chance of prevailing. This type of fair-weather loyalty and former client poaching is forbidden; an attorney may not abandon the duty not to harm a former client when circumstances make it expedient and/or self-serving to do so. As the Comment to MRPC 1.9 says, in pertinent part: "Information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client."

### 3. Waiver of the Conflict

Respondent's final fallback position, as to the MRPC 1.9 violation allegation, is that, if there existed a conflict of interest, 101 Charles waived the conflict by failing to raise an objection to Respondent's representation of TCL in the contract suit. As confirmation of the validity of his argument, Respondent relies on *Gross v. SES Americom, Inc.,* 307 F.Supp.2d 719, 723 (D.Md.2004), a case holding that a party may waive, by inaction, the right to move to disqualify a conflicted attorney. Respondent's argument, although we do not believe it to have been preserved properly for consideration by this Court, lacks merit.

Regarding preservation, we are guided by the notion that the procedures in an attorney grievance case generally are the same as in a civil proceeding. Md. Rules 16–709(e)(3) (stating

that papers and pleadings are to be filed in accordance with the rules governing procedure in Circuit Court); 16–710(d) (same for hearing procedures); 16–756 (same for discovery procedures).

■ Maryland Rule 16–754(a) requires that "[d]efenses and objections to the petition . . . shall be stated in the answer and not by preliminary motion." It is well-understood that waiver is an affirmative defense asserted appropriately in an answer, *see* Md. Rule 2–323(g), as required by Rule 16–754(a). Affirmative defenses, such as waiver, are themselves waived if not asserted in the initial answer in civil actions. *Ocean Plaza Joint Venture v. Crouse Constr. Co.*, 62 Md.App. 435, 445, 490 A.2d 252, 257–58 (1985). Because Respondent failed to assert waiver in his answer as a defense to the Petition, it could be deemed waived.

■ Frankly, it is easier in the present case to confront the merits of Respondent's argument. It appears to us that Respondent has not met his burden of proving this affirmative defense by a preponderance of the evidence. Maryland Rule 16–757(b). Respondent stakes his argument on *Gross v. SES Americom, Inc.*, where the U.S. District Court for the District of Maryland opined that a former client waived its right to move for disqualification of its former counsel, now acting as counsel for its rival in litigation. The court relied, in large part, on the untimely nature of the motion, which came approximately two years after the date on which the conflict arose. *Gross*, 307 F.Supp.2d at 723. *Gross* is inapposite here because no similar protracted time line has been shown by Respondent. The bare paragraph in which the waiver argument is asserted here merely insists that 101 Charles's competent counsel never sought disqualification, without reference to time or any of the other factors courts typically consider in waiver of conflict scenarios. *Id.* We are unpersuaded by Respondent's contention in the face of such a paucity of argument or evidence.

### B. Respondent's Alleged False Statements (MRPC 8.4(c))

Respondent excepts, on a number of fronts, to the hearing judge's supporting findings and conclusion that he violated MRPC 8.4(c). In particular, Respondent complains that the hearing judge lacked clear and convincing evidence from which to conclude that Respondent violated the Rule, failed to hold Bar Counsel to his burden of demonstrating that Respondent made false statements with the *intent* to mislead, and misapplied the burden of proof by requiring Respondent to prove that he acted innocently.

#### 1. No Clear and Convincing Evidence of a Personal Loan

We agree with Respondent's contention that Bar Counsel did not prove, by clear and convincing evidence, that Respondent testified falsely when he asserted at the deposition in the bankruptcy case that he had not borrowed personally money from Zokaites. Our conclusion is based upon the fact that the hearing judge found incorrectly that Respondent, in fact, had borrowed personally money from Zokaites.

In determining that Respondent received a personal loan, the hearing judge placed great reliance on the fact that Respondent and Zokaites entered into a Collateral Agreement that made Respondent the personal beneficiary of a $151,550.00 loan from Zokaites. The judge then noted that the later Promissory Note indicated that the loan actually was being made to TCL. Confronted by this contradiction, the judge, in reviewing several documents that allegedly showed that Respondent interchangeably employed his name and TCL's, surmised that Respondent treated TCL as his alter ego. Therefore, even if the Promissory Note stated that TCL was the borrower, the judge was persuaded that the true borrower was Respondent.

For want of clear and convincing evidence, we do not accept the rationale employed and conclusion reached by the hearing judge. On the record as we see it, it was clear error to conclude that Respondent was the borrower of the loan proceeds from Zokaites. While the Collateral Agreement pro-

vides that the loan was to be made to Respondent personally, the overwhelming other evidence indicates that this agreement was aborted and a new one was created, making TCL the borrower. Contrary to the hearing judge's conclusion, it matters not that TCL has close ties to Respondent and that the proceeds of the loan eventually were channeled to Respondent. The paper trail applicable to the loan indicates clearly that TCL was the obligor of the ultimate loan, not Respondent. The Promissory Note states that TCL was the borrower. TCL repaid its obligation in September 2004 by deducting the loan balance from the consideration Zokaites paid for TCL's 50% interest in 101 Charles. As broached during oral argument by a member of the Court, based on the evidence presented by Bar Counsel, had there been a default on the loan, Zokaites would not have been able to secure a judgment against Respondent. Thus, we sustain Respondent's exception as to this basis for violating MRPC 8.4(c).

## 2. *Respondent's Testimony That He Represented Zokaites*

Respondent also impugns the propriety of the hearing judge's findings and conclusions that Respondent made a false statement during the bankruptcy deposition that he was Zokaites's attorney. Respondent first argues that it was not proven clearly and convincingly that he intended to mislead the attorney representing a creditor conducting the deposition. He then contends that the hearing judge applied the incorrect burden of proof, requiring Respondent to prove that he was mistaken in making the deposition statement. For the reasons discussed, we reject Respondent's arguments.

Respondent attempts to draw a distinction between select other rules of attorney conduct which require a showing that a lawyer knowingly made a false statement and MRPC 8.4(c), which he contends is violated only when the knowingly false statement is made *with the intent to deceive or mislead.* We perceive no such distinction. Common sense dictates that a person who knows that his or her statement is false (conventionally known as "lying") necessarily has the intent to de-

ceive. "Opposite Day" [9] notwithstanding, we are unable to conjure a scenario in which a speaker intended to convey the truth to a listener (i.e. not deceive) by stating what the speaker knew to be false. Respondent offers *Attorney Grievance Commission v. Levitt*, 286 Md. 231, 406 A.2d 1296 (1979), as support for his fatuous distinction. Not only does *Levitt* not mention or discuss an intent element as Respondent intimates, the *Levitt* Court rather was persuaded by the context in which the knowingly false statement was made that the predecessor rule to MRPC 8.4(c) was not violated. 286 Md. at 239, 406 A.2d at 1299–1300. We see no similar context here.

Respondent refers to a bevy of cases supporting the unremarkable proposition that "[i]n Maryland, a finding of deceit and misrepresentation in a disciplinary action must be found to be intentional." *Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 78, 753 A.2d 17, 29 (2000) (citing *Attorney Grievance Comm'n v. Clements*, 319 Md. 289, 298, 572 A.2d 174, 179 (1990)); *see also Attorney Grievance Comm'n v. Jaseb*, 364 Md. 464, 478, 773 A.2d 516, 524 (2001). The "intent" element that Respondent imagines to be the missing ingredient in Bar Counsel's allegations and proof against him means only that, "in order to establish its case against [an attorney], Bar Counsel is required to prove with clear and convincing evidence that [the attorney's] supposed false statements were made with the *knowledge* that such statements were false when he made them." *Mooney*, 359 Md. at 78, 753 A.2d at 29 (emphasis added). In other words, the misrepresentation must be made by an attorney who *knows* the statement is false, rather than the product of mistake, misunder-

---

9. "Opposite Day" is a fictitious holiday, usually celebrated by school-aged children, in which statements made on that day are intentionally false, but taken to mean the opposite by listeners aware that the holiday is being celebrated. Wikipedia.org, Opposite Day, http://en.wikipedia.org/wiki/Opposite_day; *see also* Nicholas Quinn Rosenkranz, *Federal Rules of Statutory Interpretation*, 115 HARV. L. REV. 2085, 2141 (2002). For an illustration of "Opposite Day" in operation, see Liz Moody, *Discovering the Opposite of Nothing in Turkey*, MODESTO BEE, May 20, 2007, at I2.

standing, or inadvertence. *See, e.g., Jaseb,* 364 Md. at 476–77, 773 A.2d at 523–24 (finding that an attorney did not *knowingly* misrepresent that a bankruptcy petition had been filed, and thus violate MRPC 8.4(d), when she was operating under the mistaken impression that it had been filed); *Attorney Grievance Comm'n v. Kemp,* 303 Md. 664, 673–74, 496 A.2d 672, 676–77 (1985) (affirming a hearing judge's conclusion that an attorney did not violate the predecessor rule to MRPC 8.4(c) when he unwittingly misrepresented the status of a settlement offer because of a misunderstanding between the attorney and an insurance adjuster with whom he was negotiating the settlement). The knowledge that a statement is false *is* the intent to deceive which Respondent alleges has not been found.

In a final effort to prop up his intent element argument, Respondent discusses, in a footnote, the varying relevance of intent in certain violations of MRPC 8.4(c). Respondent's argument is not compelling. In this footnote, Respondent argues that *Attorney Grievance Commission v. Reinhardt,* 391 Md. 209, 892 A.2d 533 (2006), stands for the proposition that intent to deceive is important in some false statement cases, but not in others. Not only would such an amorphous holding, without explanation of when intent was significant and when not, defy logic, but Respondent plainly mischaracterizes what we held in *Reinhardt.* We said there that "specific intent is not a necessary ingredient of *dishonesty or misrepresentation." Reinhardt,* 391 Md. at 222, 892 A.2d at 540 (emphasis added). This was juxtaposed with our earlier statement in *Reinhardt* that if the *conduct* involved *fraud,* intent would become a relevant consideration in whether there was a violation of MRPC 8.4(c). 391 Md. at 221, 892 A.2d at 540 ("For example, assuming that Bar Counsel alleged that an attorney engaged in *fraudulent conduct,* evidence as to an attorney's specific intent would be relevant and properly considered in assessing whether Rule 8.4(c) was violated.") (emphasis added). Again, illustrating the point made in the present opinion, the *Reinhardt* Court found clear error in the hearing judge's determination that an attorney did not violate

MRPC 8.4(c) by making a knowingly false statement because there was no showing of a specific intent to be dishonest or misrepresent the truth. 391 Md. at 221–22, 892 A.2d at 540. It was enough to find a violation of MRPC 8.4(c) that the attorney made a knowingly false statement to his client about working on his case, when the attorney actually lost the file and was not working on it. 391 Md. at 222, 892 A.2d at 540 ("Respondent was dishonest and misrepresented the truth . . . . he unquestionably told the client a lie.").

It appears that Respondent here simply fails to appreciate the difference we have drawn between: (1) pure acts (as opposed to words), which generally are not inherently fraudulent or deceitful, and (2) knowingly making a false statement, which is inherently dishonest. In the former case, specific intent is typically necessary to be proven to demonstrate that the conduct in question was fraudulent in fact. On the other hand, words spoken by an attorney who knows they were untrue involves an inherent intent to deceive. As *Mooney* indicated, a false statement is intentionally deceitful if it is proven that the speaker knew the statement was false. 359 Md. at 78, 753 A.2d at 29. Contrary to Respondent's position, there is no additional intent element, specific or otherwise, to prove. *Reinhardt*, 391 Md. at 222, 892 A.2d at 540. We shall now examine whether the hearing judge was clearly erroneous in finding that Respondent knew it was false to assert at the bankruptcy deposition that Zokaites was his client.

Respondent asserted in his exceptions to the hearing judge's findings, and has maintained since then, that he never served as legal counsel to Zokaites. Respondent states that he only asserted during the bankruptcy deposition that he had so served because the close business relationship between the two men might have led Zokaites to believe that Respondent was his attorney, thus obligating Respondent to respect and assert attorney-client privilege. Since the deposition, however-er, Respondent asserts that, in retrospect, he mostly likely could not have been deemed to have represented Zokaites, thus explaining his change of position on the matter. The

hearing judge disbelieved Respondent's explanation. We find no basis to second-guess that assessment. On this record, Respondent had no reason to conclude that Zokaites believed Respondent to be his attorney, thus making knowingly false his statement that Zokaites was his client.

Respondent's responses to Bar Counsel's interrogatories, admitted in evidence, illustrate that Respondent was aware at the time of the transactions between Zokaites and 101 Charles, and later TCL, that Zokaites was being represented by his own counsel:

11. For the period from 2001 to present, list each position and/or title you have held or continue to hold with Transamerican Com[m]ercial, Ltd.

ANSWER: For the period from 2001 to present: General Counsel. At the 2002 settlement at which time Zokaites was represented by Donald Graham of the Law Firm of Dillon, McCandless, King, Coulter & Graham, LLP, I signed documents on behalf of Transamerican Com[m]ercial, Ltd. And also executed the 101 Charles, LLC Operating Agreement on behalf of Transamerican Com[m]ercial, Ltd.

Respondent also knew that, prior to the time at which the 101 Charles venture was launched, Zokaites was represented by the same firm, in addition to local counsel in Baltimore:

13. If you contend you advised Frank Zokaites to seek the advice of independent counsel before investing in Einstein Clinical Laboratories, S.A., [(around 2001)] state when you advised him to seek independent counsel and how you communicated such advice to him.

ANSWER: I did not advise Mr. Zokaites to seek independent counsel, *knowing that he was always represented by George Brown as local counsel* in Baltimore, *and by Donald P. Graham,* [of] Dillion, McCandless, King, Coulter & Graham, LLP in Pennsylvania.

(emphasis added). Respondent attached as an exhibit to his answers a letter he dispatched to Zokaites's Pennsylvania attorney regarding the closing on the 101 Charles transaction. His discovery responses and the letter demonstrate that, for

the time during which Respondent claimed in the bankruptcy deposition testimony he was Zokaites's attorney, Respondent thought and acted in a manner that showed Respondent actually believed others to be representing Zokaites's interests rather than himself.

Respondent, however, argues that Zokaites may have thought otherwise.[10] We do not see how. An attorney-client relationship is formed when:

(1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and . . .

(b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services

*Attorney Grievance Comm'n v. Brooke,* 374 Md. 155, 174, 821 A.2d 414, 425 (2003) (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 (2000)). Respondent, however, presented nothing to substantiate his affirmative defense that Zokaites reasonably believed Respondent to be his attorney. Although Respondent claims that he created 101 Charles at Zokaites's behest, that does not, *per se,* result inescapably in the creation of an attorney-client relationship. Rather the facts and circumstances surrounding the situation in this record, *Attorney Grievance Comm'n v. Shaw,* 354 Md. 636, 650–51, 732 A.2d 876, 883 (1999), dictate that no such relationship was formed.

Unlike the factual scenario in *Brooke,* Respondent previously had not represented Zokaites. Moreover, Respondent's creation of 101 Charles was not the act of an attorney dutifully carrying out the wishes of a client, but rather a self-interested business maneuver. We are mindful that "[i]t does

---

**10.** As support for this argument, Respondent relies on a contingent stipulation reached between him and Bar Counsel in a Proposed Reprimand disposition of this case (one ultimately not accepted by the Court in this matter) that Zokaites reasonably believed Respondent to be his attorney. Bar Counsel moved to strike the inclusion of this information, which motion we grant, pursuant to Maryland Rule 16–737(d).

not follow ... that an attorney-client relationship automatically is created whenever, and merely because, an attorney may perform a service for a person with whom he or she may have a business or other arrangement that is legal in character." *Shaw,* 354 Md. at 651, 732 A.2d at 884. Respondent formed 101 Charles out of his own self-interest in carrying forward the business transaction between himself and Zokaites rather than as a mere agent for Zokaites. This conclusion is supported by the fact that Respondent indicated that the creation of 101 Charles and the transfer of the Jefferson Building to that entity was required so that Zokaites could take an indirect ownership in the Jefferson Building, without making him a partial owner of TCL (Respondent's family enterprise), which previously owned the Jefferson Building. Simply because Respondent was an attorney did not make, by necessity, each of his actions in connection with Zokaites the result of an attorney-client relationship.

Respondent also defends his statement during the deposition that he represented Zokaites on the basis that it was an isolated example of Respondent having mis-spoken due to his advanced age of 82. This defense fails for two reasons. First, Respondent's theory is contradicted by the measured position taken by Respondent's bankruptcy counsel, Alan Grochal, Esq., who attended the relevant deposition. After repeated attempts by the deposing creditor's attorney, Richard Kremen, Esq., to extract information regarding Respondent's relationship with Zokaites, which efforts were rebuffed by Respondent's continued assertion of attorney-client privilege, Mr. Grochal reminded Mr. Kremen of the earlier letter in which Mr. Grochal stated it was his position that information pertaining to Zokaites was protected by attorney-client privilege. This type of predetermined legal position, developed by Mr. Grochal and asserted repeatedly by both he and Respondent, strikes us as hardly an isolated, forgetful mis-statement by Respondent in the heat of testimonially-induced stress. Second, the hearing judge clearly acted within the proper range of his discretion as fact-finder to make a demeanor-based assessment that Respondent's assertion was not credi-

ble that his statement during the deposition was a mistake. *Attorney Grievance Comm'n v. Lee,* 393 Md. 385, 399, 903 A.2d 360, 368 (2006); *Attorney Grievance Comm'n v. Stolarz,* 379 Md. 387, 398, 842 A.2d 42, 48 (2004). We find nothing in the record to second-guess the hearing judge on that point.

We also do not agree with Respondent's argument that the hearing judge applied the incorrect burden of proof by requiring Respondent to prove by a preponderance of evidence that Respondent merely was mistaken when he testified that he represented Zokaites. It is apparent to us that the hearing judge already had concluded that Respondent knew his statement was false and was considering the mistake defense as an affirmative defense.

Respondent's exceptions as to this MRPC 8.4(c) violation are overruled.

## V. Sanction

All that remains is to determine the proper sanction for the violations of MRPC 1.9 and 8.4(c) sustained in this opinion. Maryland Rule 16-759(c) provides that "[t]he Court of Appeals may order (1) disbarment, (2) suspension, (3) reprimand, (4) inactive status, (5) dismissal of the disciplinary or remedial action, or (6) a remand for further proceedings." Petitioner recommends that Respondent be disbarred. Respondent, on the other hand, recommends a reprimand as the appropriate sanction.

▬▬▬▬ "The gravity of misconduct is not measured solely by the number of rules broken but is determined largely by the lawyer's conduct." *Attorney Grievance Comm'n v. Briscoe,* 357 Md. 554, 568, 745 A.2d 1037, 1044 (2000) (citing *Attorney Grievance Comm'n v. Milliken,* 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998)). Furthermore, "[t]he sanction for a violation of the Maryland Rules of Professional Conduct depends on the facts and circumstances of each case, including a consideration of any mitigating factors." *Reinhardt,* 391 Md. at 223, 892 A.2d at 541 (2006) (citing *Attorney Grievance Comm'n v. Zuckerman,* 386 Md. 341, 375, 872 A.2d 693, 713

(2005)). Considering the facts and circumstances of the case, we conclude that disbarment is the proper sanction.

In *Attorney Grievance Commission v. Gore,* 380 Md. 455, 471–72, 845 A.2d 1204, 1213 (2004), we set out the primary intendment of the attorney discipline process:

> The purpose of discipline under the Maryland Rules of Professional Conduct is not to punish the lawyer, but to protect the public and the public's confidence in the legal profession. We protect the public through sanctions against offending attorneys in two ways: through deterrence of "the type of conduct which will not be tolerated," and by removing those unfit to continue in the practice of law from the rolls of those authorized to practice in this State. The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed.

We long have held that acts of dishonesty, fraud, or misleading behavior may warrant a sanction of disbarment. In *Attorney Grievance Commission v. Vanderlinde,* 364 Md. 376, 418, 773 A.2d 463, 488 (2001), we commented generally that,

> [u]nlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in any attorney's character. Disbarment ordinarily should be the sanction for intentional dishonest conduct.

We also have said that "[t]actics involving dishonesty, fraud, or deceit, carry the risk of the ultimate sanction by this Court." *Attorney Grievance Comm'n v. White,* 354 Md. 346, 366, 731 A.2d 447, 458 (1999); *see also Attorney Grievance Comm'n v. Guberman,* 392 Md. 131, 137, 896 A.2d 337, 340–41 (2006) ("[C]andor and truthfulness are two of the most important moral character traits of a lawyer.") (citations omitted).

The hearing judge found no mitigating circumstances. With 59 years experience as a member of the Maryland Bar,

Respondent should have appreciated the extent of his responsibility to act with complete honesty, but failed to comport himself properly. Accordingly, the proper sanction is disbarment.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(C), FOR WHICH SUMMARY JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST WILLIAM L. SISKIND.